# UNITED AIR LINES, INC. *v.* McMANN

No. 76–906. Argued October 4, 1977—Decided December 12, 1977

*Arnold T. Aikens* argued the cause for petitioner. With him on the briefs were *Kenneth A. Knutson, Earl G. Dolan,* and *Philip J. Hogan.*

*Francis G. McBride* argued the cause and filed a brief for respondent.*

Mr. Chief Justice Burger, delivered the opinion of the Court.

The question presented in this case is whether, under the Age Discrimination in Employment Act of 1967, retirement of an employee over his objection and prior to reaching age 65 is permissible under the provisions of a bona fide retirement plan established by the employer in 1941 and joined by the employee in 1964. We granted certiorari to resolve a conflict between the holdings of the Fifth Circuit in *Brennan* v. *Taft Broadcasting Co.,* 500 F. 2d 212 (1974), and the Fourth Circuit now before us. See *Zinger* v. *Blanchette,* 549 F. 2d 901 (CA3 1977), cert. pending, No. 76–1375.

I

The operative facts were stipulated by the parties in the District Court and are not controverted here. McMann joined United Air Lines, Inc., in 1944, and continued as an employee until his retirement at age 60 in 1973. Over the years he held various positions with United and at retirement held that of technical specialist-aircraft systems. At the time

---

*Morgan D. Hodgson, Lawrence B. Kraus,* and *Richard O'Brecht* filed a brief for the Chamber of Commerce of the United States of America as *amicus curiae* urging reversal.

*Cyril F. Brickfield, Jonathan A. Weiss,* and *Robert B. Gillan* filed a brief for the National Retired Teachers Assn. et al. as *amici curiae* urging affirmance.

McMann was first employed, United maintained a formal retirement income plan it had inaugurated in 1941, in which McMann was eligible to participate, but was not compelled to join.[1] He voluntarily joined the plan in January 1964. The application form McMann signed showed the normal retirement age for participants in his category as 60 years.

McMann reached his 60th birthday on January 23, 1973, and was retired on February 1, 1973, over his objection. He then filed a notice of intent to sue United for violation of the Act pursuant to 29 U. S. C. § 626 (d). Although he received an opinion from the Department of Labor that United's plan was bona fide and did not appear to be a subterfuge to evade the purposes of the Act, he brought this suit.

McMann's suit in the District Court seeking injunctive relief, reinstatement, and backpay alleged his forced retirement was solely because of his age and was unlawful under the Act. United's response was that McMann was retired in compliance with the provisions of a bona fide retirement plan which he had voluntarily joined. On facts as stipulated, the District Court granted United's motion for summary judgment.

In the Court of Appeals it was conceded the plan was bona fide "in the sense that it exists and pays benefits."[2] But McMann, supported by a brief *amicus curiae* filed in that court by the Secretary of Labor, contended the enforcement of the age-60 retirement provision, even under a bona fide plan instituted in good faith in 1941, was a subterfuge to evade the Act.[3]

---

[1] The plan paid retirement benefits pursuant to a group annuity contract between United and two life insurance companies.

[2] The same concession was made in this Court.

[3] No brief *amicus* was filed on behalf of the Department of Labor in this Court, but after submission of the case following oral argument the Solicitor General wrote a letter to the Clerk of this Court stating that the Government agreed with the Fourth Circuit and was prepared to file a brief *amicus* within three weeks. The Rules of this Court do not allow the

The Court of Appeals agreed, holding that a pre-age-65 retirement falls within the meaning of "subterfuge" unless the employer can show that the "early retirement provision . . . ha[s] some economic or business purpose other than arbitrary age discrimination." 542 F. 2d 217, 221 (1976). The Court of Appeals remanded the case to the District Court to allow United an opportunity to show an economic or business purpose and United sought review here.

We reverse.

## II

Section 2 (b) of the Age Discrimination in Employment Act of 1967, 81 Stat. 602, recites that its purpose is

"to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment." 29 U. S. C. § 621 (b).

Section 4 (a)(1) of the Act, 81 Stat. 603, makes it unlawful for an employer

"to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age . . . ." 29 U. S. C. § 623 (a)(1).

The Act covers individuals between ages 40 and 65, 29 U. S. C. § 631, but does not prohibit all forced retirements prior to age 65; some are permitted under § 4 (f)(2), 81 Stat. 603, which provides:

"It shall not be unlawful for an employer . . . or labor organization to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a

_____

filing of briefs *amicus* after oral argument. See Rule 42. No motion for leave to file a brief *amicus* was filed.

subterfuge to evade the purposes of this [Act], except that no such employee benefit plan shall excuse the failure to hire any individual . . . ." 29 U. S. C. § 623 (f) (2).

See *infra*, at 198–202.

McMann argues the term "normal retirement age" is not defined in the plan other than in a provision that "A Participant's Normal Retirement Date is the first day of the month following his 60th birthday." From this he contends normal retirement age does not mean mandatory or compelled retirement at age 60, and United therefore did not retire him "to observe the terms" of the plan as required by § 4 (f) (2). As to this claim, however, we accept the analysis of the plan by the Court of Appeals for the Fourth Circuit:

"While the meaning of the word 'normal' in this context is not free from doubt, counsel agreed in oral argument on the manner in which the plan is operated in practice. The employee has no discretion whether to continue beyond the 'normal' retirement age. United legally may retain employees such as McMann past age 60, but has never done so: its policy has been to retire all employees at the 'normal' age. Given these facts, we conclude that *for purposes of this decision, the plan should be regarded as one requiring retirement at age 60 rather than one permitting it at the option of the employer.*" 542 F. 2d, at 219. (Emphasis supplied.)

McMann had filed a grievance challenging his retirement since, as a former pilot, he held a position on the pilots' seniority roster. In that arbitration proceeding he urged that "normal" means "average" and so long as a participant is in good health and fit for duty he should be retained past age 60. The ruling in the arbitration proceeding was that " '[n]ormal' means regular or standard, not average, not only as a matter of linguistics but also in the general context of retirement and pension plans and the settled practice at

United." It was also ruled that the involuntary retirement of McMann "was taken in accordance with an established practice uniformly applied to all members of the bargaining unit."

Though the District Court made no separate finding as to the meaning of "normal" in this context, it had before it the definition ascribed in the arbitration proceeding and that award was incorporated by reference in the court's findings and conclusions. In light of the facts stipulated by the parties and found by the District Court, we also accept the Court of Appeals' view as to the meaning of "normal." [4]

In *Brennan* v. *Taft Broadcasting Co.*, 500 F. 2d, at 215, the Fifth Circuit held that establishment of a bona fide retirement plan long before enactment of the Act, "eliminat[ed] any notion that it was adopted as a subterfuge for evasion." [5] In

---

[4] We note, too, that the Department of Labor's interpretation of § 4 (f)(2), issued nearly contemporaneously with the effective date of the Act, was that the meaning did not turn on whether or not all employees under a plan are required to retire at the same age.

"The fact that an employer may decide to permit certain employees to continue working beyond the age stipulated in the formal retirement program does not, in and of itself, render an otherwise bona fide plan invalid, insofar as the exception provided in Section 4 (f)(2) is concerned." 29 CFR § 860.110 (a) (1976).

The Department's more recent position on the section is that pre-65 retirements "are unlawful unless the mandatory retirement provision . . . is required by the terms of the plan and is not optional . . . ." U. S. Department of Labor, Annual Report on Age Discrimination in Employment Act of 1967, p. 17 (1975). Having concluded, as did the Court of Appeals, that the United plan calls for mandatory retirement at age 60, however, we need not consider this further.

[5] Similarly, in *De Loraine* v. *MEBA Pension Trust*, 499 F. 2d 49 (CA2), cert. denied, 419 U. S. 1009 (1974), the court said a bona fide pension plan established in 1955 was not a subterfuge. That case did not properly present the question of whether the Act forbade involuntary retirement before age 65 and the court did not purport to decide it. 499 F. 2d, at 51 n. 7. *Steiner* v. *National League of Professional Baseball Clubs*, 377 F. Supp. 945, 948 (CD Cal. 1974), aff'd, No. 74–2604 (CA9, Oct. 15, 1975),

rejecting the *Taft* reasoning, the Fourth Circuit emphasized that it distinguished between the Act and the *purposes* of the Act. The distinction relied on is untenable because the Act is the vehicle by which its purposes are expressed and carried out; it is difficult to conceive of a subterfuge to evade the one which does not also evade the other.

McMann argues that § 4 (f) (2) was not intended to authorize involuntary retirement before age 65, but was only intended to make it economically feasible for employers to hire older employees by permitting the employers to give such older employees lesser retirement and other benefits than provided for younger employees. We are persuaded that the language of § 4 (f) (2) was not intended to have such a limited effect.

In *Zinger* v. *Blanchette,* 549 F. 2d 901 (1977), the Third Circuit had before it both the *Taft* and *McMann* decisions. It accepted *McMann*'s distinction between the Act and its purposes, which, in this setting, we do not, but nevertheless concluded:

> "The primary purpose of the Act is to prevent age discrimination in *hiring* and *discharging* workers. There is, however, a clear, measurable difference between outright discharge and retirement, a distinction that cannot be overlooked in analyzing the Act. While discharge without compensation is obviously undesirable, retirement on an adequate pension is generally regarded with favor. A careful examination of the legislative history demonstrates that, while cognizant of the disruptive effect retirement may have on individuals, Congress continued to regard retirement plans favorably and chose therefore to legislate only with respect to discharge." 549 F. 2d, at 905. (Emphasis supplied; footnote omitted.)

likewise rejected the idea that a pension plan established long before the Act could be a subterfuge saying: "Obviously it could not have been evolved in an attempt to circumvent any public policy or law."

The dissent relies heavily upon the legislative history, which by traditional canons of interpretation is irrelevant to an unambiguous statute. However, in view of the recourse to the legislative history we turn to that aspect to demonstrate the absence of any indication of congressional intent to undermine the countless bona fide retirement plans existing in 1967 when the Act was passed. Such a pervasive impact on bona fide existing plans should not be read into the Act without a clear, unambiguous expression in the statute.

When the Senate Subcommittee was considering the bill, the then Secretary of Labor, Willard Wirtz, was asked what effect the Act would have on existing pension plans. His response was:

"It would be my judgment . . . that the effect of the provision in 4 (f) (2) [of the original bill] . . . is to protect the application of almost all plans which I know anything about. . . . It is intended to protect retirement plans." Hearings on S. 830 before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 90th Cong., 1st Sess., 53 (1967) (hereafter Senate Hearings).[6]

When the present language of § 4 (f) (2) was later proposed by amendments, Mr. Wirtz again commented that established pension plans would be protected. Hearings on H. R. 4221 et al. before the General Subcommittee on Labor of the House Committee on Education and Labor, 90th Cong., 1st Sess., 40 (1967).

Senator Javits' concern with the administration version of § 4 (f) (2), expressed in 1967 when the legislation was being debated, was that it did not appear to give employers flexibility

---

[6] Section 4 (f) (2) of the original administration bill provided: "It shall not be unlawful for an employer . . . to separate involuntarily an employee under a retirement policy or system where such policy or system is not merely a subterfuge to evade the purposes of this Act . . . ."

to hire older employees without incurring extraordinary expenses because of their inclusion in existing retirement plans. His concern was not, as inferred by the dissent, that involuntary retirement programs would still be allowed. He said,

> "The administration bill, which permits involuntary separation under bona fide retirement plans meets only part of the problem. It does not provide any flexibility in the amount of pension benefits payable to older workers depending on their age when hired, and thus may actually encourage employers, faced with the necessity of paying greatly increased premiums, to look for excuses not to hire older workers when they might have hired them under a law granting them a degree of flexibility with respect to such matters.
>
> "That flexibility is what we recommend.
>
> "We also recommend that the age discrimination law should not be used as the place to fight the pension battle but that we ought to subordinate the importance of adequate pension benefits for older workers in favor of the employment of such older workers and not make the equal treatment under pension plans a condition of that employment." Senate Hearings 27.[7]

In keeping with this objective Senator Javits proposed the amendment, which was incorporated into the 1967 Act, calling for "a fairly broad exemption . . . for bona fide retirement and seniority systems which will facilitate hiring rather than deter it and make it possible for older workers to be employed without the necessity of disrupting those systems." *Id.*, at 28.

The true intent behind § 4 (f)(2) was not lost on the representatives of organized labor; they viewed it as protecting

---

[7] Legislative observations 10 years after passage of the Act are in no sense part of the legislative history. See *post*, at 218.

an employer's right to require pre-65 retirement pursuant to a bona fide retirement plan and objected to it on that basis. The legislative director for the AFL–CIO testified:

> "We likewise do not see any reason why the legislation should, as is provided in section 4 (f)(2) of the Administration bill, permit involuntary retirement of employees under 65. . . . Involuntary retirement could be forced, regardless of the age of the employee, subject only to the limitation that the retirement policy or system in effect may not be merely a subterfuge to evade the Act." Senate Hearings 96.

In order to protect workers against involuntary retirement, the AFL–CIO suggested an "Amendment to Eliminate Provision Permitting Involuntary Retirement From the Age Discrimination in Employment Act, and to Substitute Therefor Provision Safeguarding Bona Fide Seniority or Merit Systems," which would have deleted any reference to retirement plans in the exception. *Id.*, at 100. This amendment was rejected.

But, as noted in *Zinger,* 549 F. 2d, at 907, the exemption of benefit plans remained in the bill as enacted notwithstanding labor's objection, and the labor-proposed exemption for seniority systems was added. There is no basis to view the final version of § 4 (f)(2) as an acceptance of labor's request that the benefit-plan provision be deleted; the plain language of the statute shows it is still there, albeit in different terms.

Also added to the section when it emerged from the Senate Subcommittee is the language "except that no such employee benefit plan shall excuse the failure to hire any individual." Rather than reading this addendum as a redundancy, as does the dissent, *post,* at 212, and n. 5, it is clear this is the result of Senator Javits' concern that observance of existing retirement plan terms might discourage hiring of older workers. *Supra,* at 200. Giving meaning to each of these provisions leads in-

escapably to the conclusion they were intended to permit observance of the mandatory retirement terms of bona fide retirement plans, but that the existence of such plans could not be used as an excuse not to hire any person because of age.

There is no reason to doubt that Secretary Wirtz fully appreciated the difference between the administration and Senate bills. He was aware of Senator Javits' concerns, and knew the Senator sought to amend the original bill to focus on the *hiring* of older persons notwithstanding the existence of pension plans which they might not economically be permitted to join. See Senate Hearings 40. Senator Javits' view was enacted into law making it possible to employ such older persons without compulsion to include them in pre-existing plans.

The dissent misconceives what was said in the Senate debate. The dialogue between Senators Javits and Yarborough, the minority and majority managers of the bill, respectively, is set out below [8] and clearly shows awareness of the continued vitality of pre-age-65 retirements.

---

[8] "Mr. YARBOROUGH. I wish to say to the Senator that that is basically my understanding of the provision in line 22, page 20 of the bill, clause 2, subsection (f) of section 4, when it refers to retirement, pension, or insurance plan, it means that a man who would not have been employed except for this law does not have to receive the benefits of the plan. Say an applicant for employment is 55, comes in and seeks employment, and the company has bargained for a plan with its labor union that provides that certain moneys will be put up for a pension plan for anyone who worked for the employer for 20 years so that a 55-year-old employee would not be employed past 10 years. This means he cannot be denied employment because he is 55, but he will not be able to participate in that pension plan because unlike a man hired at 44, he has no chance to earn 20 years retirement. In other words, this will not disrupt the bargained-for pension plan. This will not deny an individual employment or prospective employment but will limit his rights to obtain full consideration in the pension, retirement, or insurance plan.

"Mr. JAVITS. I thank my colleague. That is important to business people." 113 Cong. Rec. 31255 (1967).

## III

In this case, of course, our function is narrowly confined to discerning the meaning of the statutory language; we do not pass on the wisdom of fixed mandatory retirements at a particular age. So limited, we find nothing to indicate Congress intended wholesale invalidation of retirement plans instituted in good faith before its passage, or intended to require employers to bear the burden of showing a business or economic purpose to justify bona fide pre-existing plans as the Fourth Circuit concluded. In ordinary parlance, and in dictionary definitions as well, a subterfuge is a scheme, plan, stratagem, or artifice of evasion. In the context of this statute, "subterfuge" must be given its ordinary meaning and we must assume Congress intended it in that sense. So read, a plan established in 1941, if bona fide, as is conceded here, cannot be a subterfuge to evade an Act passed 26 years later. To spell out an intent in 1941 to evade a statutory requirement not enacted until 1967 attributes, at the very least, a remarkable prescience to the employer. We reject any such *per se* rule requiring an employer to show an economic or business purpose in order to satisfy the subterfuge language of the Act.[9]

---

[9] Reference is made by the dissent, *post*, at 219 n. 13, to a recital on § 4 (f) (2) in the House Report. The House Report states:

"[Section 4 (f) (2)] applies to new and existing employee benefit plans, and to both the establishment and maintenance of such plans. *This exception serves to emphasize the primary purpose of the bill—hiring of older workers—by permitting employment without necessarily including such workers in employee benefit plans.* The specific exception was an amendment to the original bill, is considered vita[l] to the legislation, and was favorably received by witnesses at the hearings." H. R. Rep. No. 805, 90th Cong., 1st Sess., 4 (1967). (Emphasis supplied.)

The italicized portion shows quite clearly that the primary purpose of the bill was the hiring of older workers. A quite different question would be presented if a pre-existing bona fide plan were used as a reason for refusing to *hire* an older applicant for employment.

Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE STEWART, concurring in the judgment.

The Age Discrimination in Employment Act of 1967, 29 U. S. C. § 621 *et seq.,* forbids any employer to discharge or otherwise discriminate against any employee between the ages of 40 and 65 because of his age. 29 U. S. C. § 623 (a)(1). But the Act also expressly provides that it is not unlawful for an employer to observe the terms of a bona fide employee benefit plan, such as a retirement plan, so long as the plan is not a "subterfuge to evade the purposes" of the Act. § 623 (f)(2).

It is conceded that United's retirement plan is bona fide. The only issue, then, is whether it is a "subterfuge to evade the purposes" of the Act. I think it is simply not possible for a bona fide retirement plan adopted long before the Act was even contemplated to be a "subterfuge" to "evade" either its terms or its purposes.

Since § 623 (f)(2) on its face makes United's action under the retirement plan lawful, it is unnecessary to address any of the other questions discussed in the Court's opinion or by MR. JUSTICE WHITE.

MR. JUSTICE WHITE, concurring in the judgment.

I

While I agree with the Court and with MR. JUSTICE STEWART that McMann's forced retirement at age 60 pursuant to United's retirement income plan does not violate the Age Discrimination in Employment Act of 1967, 29 U. S. C. § 621 *et seq.,* I disagree with the proposition that this bona fide plan necessarily is made lawful under § 4 (f)(2) of the Act, 29

U. S. C. § 623 (f) (2), merely because it was adopted long before the Act's passage. Even conceding that the retirement plan could not have been a subterfuge to evade the purposes of the Act when it was adopted by United in 1941, I believe that the decision by United to continue the mandatory aspects of the plan after the Act became effective in 1968 must be separately examined to determine whether it is proscribed by the Act.

The legislative history indicates that the exception contained within § 4 (f) (2) "applies to new and *existing* employee benefit plans, and to both the establishment and *maintenance* of such plans." H. R. Rep. No. 805, 90th Cong., 1st Sess., 4 (1967) (emphasis supplied); S. Rep. No. 723, 90th Cong., 1st Sess., 4 (1967) (emphasis supplied). This statement in both the House and Senate Reports demonstrates that there is no magic in the fact that United's retirement plan was adopted prior to the Act, for not only the plan's establishment but also its maintenance must be scrutinized. For that reason, unless United was legally bound to continue the mandatory retirement aspect of its plan, its decision to continue to require employees to retire at age 60 after the Act became effective must be viewed in the same light as a post-Act decision to adopt such a plan.

No one has suggested in this case that United did not have the legal option of altering its plan to allow employees who desired to continue working beyond age 60 to do so; at the most it has been concluded that United simply elected to apply its retirement policy uniformly. See *ante,* at 196. Because United chose to continue its mandatory retirement policy beyond the effective date of the Act, I would not terminate the inquiry with the observation that the plan was adopted long before Congress considered the age discrimination Act but rather would proceed to what I consider to be the crucial question: Does the Act prohibit the mandatory retirement pursuant to a bona fide retirement plan of an employee before

he reaches age 65? My reading of the legislative history, set out in Part II of the Court's opinion, convinces me that it does not.

## II

As the opinion of the Court demonstrates, Congress in passing the Act did not intend to make involuntary retirements unlawful. In recommending the legislation to Congress, President Johnson specifically suggested an exception for those "special situations . . . where the employee is separated under a regular retirement system." 113 Cong. Rec. 1089–1090 (1967).[1] Pursuant to this recommendation, the House and Senate bills that were referred to committee expressly excepted involuntary retirements from the Act's prohibition,[2] an exception which, with only slight changes, remained in the final version enacted by Congress. As the Court correctly concludes, the changes that were made in § 4 (f) (2) were intended, not to eliminate the protection for retirement plans, but rather to meet the additional concern expressed by Senator Javits concerning the applicability of retirement plans to older workers who are hired. While the discussion in Congress concerning the language change was not extensive, it indicated that the change was intended to broaden the exception for retirement plans. I thus find unacceptable the dissent's view that Congress acceded to labor's suggestion that the protection for involuntary retirement be eliminated.

## III

In this case, the Fourth Circuit recognized the fact that United's retirement plan is "bona fide" in the sense that it

---

[1] Other exceptions recommended by the President, which were included within the final version of the Act, covered "special situations where age is a reasonable occupational qualification, [and] where an employee is discharged for good cause . . . ." 113 Cong. Rec. 1089–1090 (1967).

[2] S. 830, 90th Cong., 1st Sess. (1967); H. R. 4221, 90th Cong., 1st Sess. (1967).

provides McMann with substantial benefits. The court, however, viewed as separate and additional the requirement that the plan not be a subterfuge to evade the purposes of the Act. I find no support in the legislative history for the interpretation of that language as requiring "some economic or business purpose." 542 F. 2d 217, 221 (CA4 1976). Rather, as I read the history, Congress intended to exempt from the Act's prohibition all retirement plans—even those whose only purpose is to terminate the services of older workers—as long as the benefits they pay are not so unreasonably small as to make the "retirements" nothing short of discharges.

What little discussion there was in Congress concerning the meaning of the § 4 (f)(2) exception indicates that the no-subterfuge requirement was merely a restatement of the requirement that the plan be bona fide. See 113 Cong. Rec. 31255 (1967). It is significant that the subterfuge language was contained in the original administration bill, for that version was recognized as being "intended to protect retirement plans." See *ante,* at 199. Because all retirement plans necessarily make distinctions based on age, I fail to see how the subterfuge language, which was included in the original version of the bill and was carried all the way through, could have been intended to impose a requirement which almost no retirement plan could meet. For that reason I would interpret the § 4 (f)(2) exception as protecting actions taken pursuant to a retirement plan which is designed to pay substantial benefits.

Because the Court relies exclusively upon the adoption date of United's retirement plan as a basis for concluding that McMann's forced retirement was not unlawful, I cannot join its opinion. Instead, I would adopt the approach taken by the Third Circuit in *Zinger* v. *Blanchette,* 549 F. 2d 901 (1977), cert. pending, No. 76–1375, and would hold that his retirement was valid under the Act, not because the retirement plan was adopted by United prior to the Act's passage, but because the

Act does not prohibit involuntary retirements pursuant to bona fide plans.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting.

Today the Court, in its first encounter with the Age Discrimination in Employment Act of 1967, 81 Stat. 602, 29 U. S. C. § 621 *et seq.,* sharply limits the reach of that important law. In apparent disregard of settled principles of statutory construction, it gives an unduly narrow interpretation to a congressional enactment designed to remedy arbitrary discrimination in the workplace. Because I believe that the Court misinterprets the Act, I respectfully dissent.

But for § 4 (f) (2) of the Act, 29 U. S. C. § 623 (f) (2), petitioner's decision to discharge respondent because he reached the age of 60 would violate § 4 (a) (1), 29 U. S. C. § 623 (a) (1). This latter section makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual [between 40 and 65] with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."

The language used in § 4 (a) (1) tracks the language of § 703 (a) (1) of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–2 (a) (1).[1] This section has been interpreted as forbidding involuntary retirement when improper criteria, such as race or sex, are used in selecting those to be retired. With reference to the statutory language, courts have reasoned that forced retirement is "tantamount to a discharge," *Bartmess* v. *Drewrys U. S. A., Inc.,* 444 F. 2d 1186, 1189 (CA7), cert. denied, 404 U. S. 939 (1971), or that the employer requiring

---

[1] Section 703 (a) (1) provides that it is unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."

retirement is "discriminat[ing] against" the retired employee "with respect to . . . [a] condition . . . of employment," see *Peters* v. *Missouri-Pacific R. Co.,* 483 F. 2d 490, 492 n. 3 (CA5), cert. denied, 414 U. S. 1002 (1973); *Rosen* v. *Public Service Electric & Gas Co.,* 477 F. 2d 90, 94–95 (CA3 1973); *Bartmess* v. *Drewrys U. S. A., Inc., supra,* at 1188–1189.[2]

Given these constructions of § 703 (a)(1) of the Civil Rights Act and the absence of any indication that Congress intended § 4 (a)(1) of the Age Discrimination in Employment Act to be interpreted differently, I would construe the identical language of the two statutes in an identical manner. The question that remains is whether § 4 (f)(2) sanctions this otherwise unlawful act. That section provides:

> "It shall not be unlawful for an employer . . . to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of ·[the Act] . . . ."

The opinion of the Court assumes that this language is clear on its face. *Ante,* at 199. I cannot agree with this premise. In my view, the statutory language is susceptible of at least two interpretations, and the only reading consonant with congressional intent would preclude involuntary retirement of employees covered by the Act.

On this latter reading, § 4 (f)(2) allows different treatment of older employees only with respect to the benefits paid or available under certain employee benefit plans, including pen-

---

[2] Courts have also suggested that involuntary retirement of an employee on a discriminatory basis might violate § 703 (a)(2) of the Civil Rights Act of 1964, which proscribes classification by an employer of an employee in a way which would "adversely affect his status as an employee," 42 U. S. C. § 2000e–2 (a)(2). *Bartmess* v. *Drewrys U. S. A., Inc.,* 444 F. 2d, at 1189; *Peters* v. *Missouri-Pacific R. Co.,* 483 F. 2d, at 495. Section 4 (a)(2) of the Age Discrimination in Employment Act, 29 U. S. C. § 623 (a)(2), includes an identical prohibition.

sion and retirement plans.[3] Alternatively, the section may be read, as the Court has read it, also to permit involuntary retirement of older employees prior to age 65 pursuant to a pension or retirement benefit plan. *Ante,* at 198. The critical question, then, is whether the phrase "employee benefit plan," as used by Congress here to include a "retirement, pension or insurance plan," encompasses only the rules defining what benefits retirees receive, or whether it also encompasses rules mandating retirement at a particular age.

We need not decide on a strictly grammatical basis which reading is preferable. We are judges, not linguists, and our task is to divine congressional intent, using all available evidence. "[W]ords are inexact tools at best, and for that reason there is wisely no rule of law forbidding resort to explanatory legislative history no matter how 'clear the words may appear on "superficial examination." ' " *Harrison* v. *Northern Trust Co.,* 317 U. S. 476, 479 (1943), quoting *United States* v. *American Trucking Assns.,* 310 U. S. 534, 544 (1940). See *Train* v. *Colorado Public Interest Research Group,* 426 U. S. 1, 10 (1976).

The Court's analysis of the legislative history establishes that the primary purpose of the Act was to facilitate the

---

[3] This reading is illustrated by Senator Yarborough's example of the effect of § 4 (f) (2):

"Say an applicant for employment is 55, comes in and seeks employment, and the company has bargained for a plan with its labor union that provides that certain moneys will be put up for a pension plan for anyone who worked for the employer for 20 years so that a 55-year-old employee would not be employed past 10 years. This means he cannot be denied employment because he is 55, but he will not be able to participate in that pension plan because unlike a man hired at 44, he has no chance to earn 20 years retirement. In other words, this will not disrupt the bargained-for pension plan. This will not deny an individual employment or prospective employment but will limit his rights to obtain full consideration in the pension, retirement, or insurance plan." 113 Cong. Rec. 31255 (1967).

hiring of older workers. I have no quarrel with that proposition. Understanding this primary purpose, however, aids not at all in determining whether Congress also intended to prohibit forced retirement of those already employed. The Court's analysis of the legislative history on this issue, *ante*, at 199–202, on which MR. JUSTICE WHITE relies, *ante*, at 206, is unpersuasive, since it relies primarily on references to an exception that was not enacted.

There can be no question, that had Congress enacted § 4 (f)(2) in the form in which it was proposed by the administration, forced retirement would be permissible. That section of the initial bill quite specifically allowed such retirement. It provided:

> "It shall not be unlawful for an employer . . . to separate involuntarily an employee under a retirement policy or system where such policy or system is not merely a subterfuge to evade the purposes of this Act . . . ." S. 830 and H. R. 4221, § 4 (f)(2), 90th Cong., 1st Sess. (1967).

Thus the remarks of Secretary Wirtz, Senator Javits, and the representative of the AFL–CIO on which the Court relies, see *ante*, at 199–201, quite properly reflect that the bill as it then existed would have authorized involuntary retirement. But the present benefit-plan exception to the § 4 (a) prohibition on age discrimination differs significantly from that contained in the original bill. The specific authorization for involuntary retirement was deleted. That this deletion was made may of itself suggest that Congress concluded such an exception was unwise; a review of the legislative history strongly supports this view.

Two sets of objections were made to the bill during the Senate and House hearings.[4] Many persons, including mem-

---

[4] Hearings on S. 830 et al. before the Subcommittee on Labor of the Senate Committee on Labor and Public Welfare, 90th Cong., 1st Sess. (1967) (hereafter Senate Hearings); Hearings on H. R. 4221 et al. before

bers of the Committees, expressed concern that the bill did "not provide any flexibility in the amount of pension benefits payable to older workers depending on their age when hired, and thus may actually encourage employers, faced with the necessity of paying greatly increased premiums, to look for excuses not to hire older workers when they might have hired them under a law granting them a degree of flexibility with respect to such matters." Statement of Sen. Javits, Senate Hearings 27; see also, e. g., House Hearings 62–63 (statement of Labor Counsel, Chamber of Commerce of the United States). Representatives of organized labor voiced totally different objections to the initial version of § 4 (f)(2); they argued against permitting any involuntary retirement based on age for those within the coverage of the bill, whether or not pursuant to a bona fide plan. Senate Hearings 98; House Hearings 413. In addition, they suggested that bona fide seniority systems should receive express protection under § 4 (f).

After the hearings, the House and Senate Committees changed the exemption section to its present form. By adding to § 4 (f)(2) a provision permitting observance of bona fide seniority systems, Congress acceded to organized labor's concern that seniority systems not be abrogated. The addition of language permitting observance of the terms of a benefit plan was plainly responsive to the numerous criticisms that the bill would deter employment of older workers.[5] But the third change that was made—the deletion of the specific language permitting involuntary retirement—was not responsive to either of those criticisms, since deletion of that language could have no effect on the hiring of older workers or on seniority systems. A reasonable inference to be drawn from the dele-

the General Subcommittee on Labor of the House Committee on Education and Labor, 90th Cong., 1st Sess. (1967) (hereafter House Hearings).

[5] The Committees' concern that the Act not deter employers from hiring older employees is also reflected in the amendment to the section providing that "no such employee benefit plan shall excuse the failure to hire any individual." § 4 (f)(2), 29 U. S. C. § 623 (f)(2).

tion, therefore, is that Congress was responding to labor's other objection by removing the authorization for involuntary retirement from the exceptions to the statute's prohibitions. While, as the Court notes, *ante,* at 201, the specific language proposed by labor was not adopted, the Court offers no alternative explanation for the deletion of the explicit authorization for involuntary retirement.[6]

In contrast to the hearings on the original version of the § 4 (f) (2) exception, where there are repeated references to the fact that the bill permitted involuntary retirement, there are no similar statements in the Committee Reports or in the House and Senate debates with respect to the amended version of § 4 (f) (2). For example, the House and Senate Committee Reports explain the purpose and effect of § 4 (f) (2) as follows:

> "This exception serves to emphasize the primary purpose of the bill—hiring of older workers—by permitting employment without necessarily including such workers in employee benefit plans. The specific exception was an amendment to the original bill, is considered vita[l] to the legislation, and was favorably received by witnesses at the hearings." H. R. Rep. No. 805, 90th Cong., 1st Sess., 4 (1967).

See S. Rep. No. 723, 90th Cong., 1st Sess., 4 (1967).[7] Nowhere did the Committees suggest that the exemption per-

---

[6] The Committees were certainly aware that Congress could retain the provision specifically authorizing involuntary retirement and add to it a provision permitting variation in the coverage of insurance and benefit plans. Many of the state statutes at which the Committees looked employed that approach. Senate Hearings 298–315; House Hearings 501–518 (*e. g.,* Connecticut, Indiana, Maine, Pennsylvania). That they deleted the specific authorization rather than follow the model of those state statutes is not without significance.

[7] The Senate Committee Report's description, although otherwise identical, did not include the statement that the amendment was considered vital. *Supra,* this page.

mitted involuntary retirements. Indeed, their emphasis on encouraging the employment of older workers by allowing employers to make distinctions based on age in the provision of certain ancillary employment benefits, fully accords with the view that § 4 (f)(2) was intended only to permit those variations. Moreover, when the sponsors of the legislation explained the bill to the House and Senate during the debates preceding its passage, they made no mention of the possibility that § 4 (f)(2) permitted involuntary retirement and discussed it in terms incompatible with any such interpretation.[8] The following exchange between Senator Javits, the minority floor manager of the bill and Senator Yarborough, the majority floor manager, is illustrative:

> "Mr. JAVITS. The meaning of this provision is as follows: An employer will not be compelled under this section to afford to older workers exactly the same pension, retirement, or insurance benefits as he affords to younger workers. If the older worker chooses to waive all of those provisions, then the older worker can obtain the benefits of this act, but the older worker cannot compel an employer through the use of this act to undertake some special relationship, course, or other condition with respect to a retirement, pension, or insurance plan which is not merely a subterfuge to evade the purposes of the act—

---

[8] During the hearings, Senator Javits indicated that the administration bill might raise problems concerning existing pension plans. He stated that the involuntary retirement provision did not adequately address whether variations in benefits based on age would be permitted. Senate Hearings 27. Although, as the Court notes, he offered no objection during the hearings to the provision allowing involuntary retirement, it is significant that at no point in his statements on the floor of the Senate did he even hint that the bill as revised permitted involuntary retirement. Since Senator Javits had expressly acknowledged the permissibility of involuntary retirement under the administration's bill at the hearings, in explaining at length the meaning of § 4 (f)(2) as revised by the Committee he would surely have adverted to involuntary retirement if it were still allowed.

and we understand that—in order to give that older employee employment on the same terms as others.

"I would like to ask the manager of the bill whether he agrees with that interpretation, because I think it is very necessary to make its meaning clear to both employers and employees. . . .

"Mr. YARBOROUGH. I wish to say to the Senator that that is basically my understanding of the provision in line 22, page 20 of the bill, clause 2, subsection (f) of section 4, when it refers to retirement, pension, or insurance plan, it means that a man who would not have been employed except for this law does not have to receive the benefits of the plan. Say an applicant for employment is 55, comes in and seeks employment, and the company has bargained for a plan with its labor union that provides that certain moneys will be put up for a pension plan for anyone who worked for the employer for 20 years so that a 55-year-old employee would not be employed past 10 years. This means he cannot be denied employment because he is 55, but he will not be able to participate in that pension plan because unlike a man hired at 44, he has no chance to earn 20 years retirement. In other words, this will not disrupt the bargained-for pension plan. *This will not deny an individual employment or prospective employment but will limit his rights to obtain full consideration in the pension, retirement, or insurance plan.*

"Mr. JAVITS. I thank my colleague. That is important to business people." 113 Cong. Rec. 31255 (1967) (emphasis added).[9]

---

[9] The Court somehow finds that the above dialogue indicates approval by Senators Yarborough and Javits of mandatory retirement before age 65. *Ante,* at 202. I see nothing in this dialogue to suggest that the Senators thought involuntary retirement before age 65 was permissible.

216

The statements of those who criticized the bill for not going far enough lend still further support to the interpretation of the Act that would preclude forced retirement of persons covered by the Act. Senator Young spoke eloquently against subjecting those aged 65 or older to "[c]ompulsory retirement programs" which, he proclaimed, "have forged an iron collar" for those Americans "ready, willing and able" to work past 65. *Id.,* at 31256. Senator Young never alluded to the possibility that compulsory retirement of those under 65 and thus covered by the Act would be permitted, since the unmistakable premise of his argument was that, under the law being considered, compulsory retirement of covered employees was prohibited. *Ibid.* Others criticized § 4 (f)(2) because it authorized employers to deny older employees various benefits in accordance with benefit plans, but again made no reference to the possibility of forced retirement of covered employees. 113 Cong. Rec., at 34745 (remarks of Rep. Smith); *id.,* at 34750 (remarks of Rep. Randall). In view of the tenor and substance of those objections to the Act, it is inconceivable that these Congressmen would have remained silent had they understood § 4 (f)(2) to allow involuntary retirement before the age of 65.[10]

---

[10] In contrast to this history which demonstrates forcefully that § 4 (f)(2) was not intended to provide for involuntary retirement, there are only two pieces of legislative history that provide even a modicum of support for the Court's interpretation. First, when he testified during the hearings on the House bill which then specifically permitted involuntary retirement, Secretary Wirtz was asked about the effect of the Senate Committee's modification of § 4 (f)(2). He responded that "[w]e count that change as not going to the substance and involving matters going to clarification which would present no problem." House Hearings 40. Since no exemption for benefit plans had been provided in the original bill, it is difficult to understand how Secretary Wirtz could reasonably have called the change only a "clarification." In any event, his statement at the hearings is entitled to far less weight than the Committee Reports and the statements by the floor managers and sponsors of the Act. See *Maintenance*

Any doubt as to the correctness of reading the Act to prohibit forced retirement is dispelled by considering the anomaly that results from the Court's contrary interpretation. Under §§ 4 (a) and 4 (f)(2), see n. 5, *supra,* it is unlawful for an employer to refuse to hire a job applicant under the age of 65 because of his age. If, as the Court holds, involuntary retirement before age 65 is permissible under § 4 (f)(2), the individual so retired has a simple route to regain his job: He need only reapply for the vacancy created by his retirement. As a new applicant, the individual plainly cannot be denied the job because of his age. And as someone with experience in performing the tasks of the "vacant" job he once held, the individual likely will be better qualified than any other applicant. Thus the individual retired one day would have to be hired the next. We should be loathe to attribute to Congress an intention to produce such a bizarre result.

One final reason exists for rejecting the Court's broad interpretation of the Act's exemption. The Age Discrimination in Employment Act is a remedial statute designed, in the Act's own words, "to promote employment of older persons based on their ability rather than age; to prohibit arbitrary

---

*Employes* v. *United States,* 366 U. S. 169, 176–177 (1961); *Leedom* v. *Mine, Mill, & Smelter Workers,* 352 U. S. 145, 149–150 (1956).

Second, on the House floor, Representatives Eilberg and Olsen, in voicing their support for the bill, stated that one reason the bill was necessary was that people who were retired needed to have opportunities for other employment open to them. 113 Cong. Rec. 34745 (1967); *id.,* at 34746. It is not entirely clear whether they were referring to people who would be involuntarily retired in the future, or only to those who had been retired prior to enactment of the Act. But even if they were implicitly expressing the view that the Act permits involuntary retirement, their statements stand in opposition to the clear import of every other statement on the floor of each House, as well as to the Committee Reports. Such a conflict must be resolved in favor of "the statements of those . . . most intimately connected with the final version of the statute." *Maintenance Employes* v. *United States, supra,* at 176–177. See remarks of Senator Yarborough, quoted *supra,* at 215.

age discrimination in employment; [and] to help employers and workers find ways of meeting problems arising from the impact of age on employment." § 2 (b), 29 U. S. C. § 621 (b). It is well settled that such legislation should "be given a liberal interpretation . . . [and] exemptions from its sweep should be narrowed and limited to effect the remedy intended." *Piedmont & Northern R. Co.* v. *ICC*, 286 U. S. 299, 311–312 (1932). See also, *e. g., Phillips Co.* v. *Walling*, 324 U. S. 490, 493 (1945). To construe the § 4 (f)(2) exemption broadly to authorize involuntary retirement when no statement in the Committee Reports or by the Act's floor managers or sponsors in the debates supports that interpretation flouts this fundamental principle of construction.

The mischief the Court fashions today may be short lived. Both the House and Senate have passed amendments to the Act. 123 Cong. Rec. H9984–9985 (daily ed. Sept. 23, 1977); *id.*, at S17303 (daily ed. Oct. 19, 1977). The amendments to § 4 (f)(2) expressly provide that the involuntary retirement of employees shall not be permitted or required pursuant to any employee benefit plan. Thus, today's decision may have virtually no prospective effect.[11] But the Committee Reports of both Houses make plain that, properly understood, the existing Act already prohibits involuntary retirement, and that the amendment is only a clarification necessitated by court decisions misconstruing congressional intent. H. R. Rep. No. 95–527, pp. 5–6 (1977); *id.*, at 27 (additional views of Rep. Weiss, quoting statement of Sen. Javits); S. Rep. No. 95–493, pp. 9–10 (1977).[12] Because the Court today has also

---

[11] Indeed both the House and Senate bills provide that, because the addition to § 4 (f)(2) is only a clarification, it is to be effective immediately; by contrast, the effective date for other changes regarded as alterations of the 1967 Act has been deferred.

[12] The Committee Reports cite and discuss *Zinger* v. *Blanchette*, 549 F. 2d 901 (CA3 1977), cert. pending, No. 76–1375; *Brennan* v. *Taft Broadcasting Co.*, 500 F. 2d 212 (CA5 1974); and the instant case. H. R. Rep. No. 95–527, p. 5; S. Rep. No. 95–493, p. 10.

misconstrued congressional intent and has thereby deprived many older workers of the protection which Congress sought to afford, I must dissent.[13]

---

[13] Because I do not interpret § 4 (f) (2) to authorize involuntary retirement, I have no occasion to address the questions discussed by the Court, *ante,* at 197–198, and by MR. JUSTICE STEWART, *ante,* at 204, as to whether the plan involved here is "a subterfuge to evade the purposes of [the Act]," 29 U. S. C. § 623 (f) (2). I am compelled to note, however, my emphatic disagreement with their suggestion that a pre-Act plan cannot be a subterfuge to avoid the purposes of the Act. The 1967 Committee Reports of both Houses expressly state: "It is important to note that [§ 4 (f) (2)] applies to new and existing employee benefit plans, and to both the establishment and maintenance of such plans. This exception serves to emphasize the primary purpose of the bill—hiring of older workers—by permitting employment without necessarily including such workers in employee benefit plans. The specific exception was an amendment to the original bill, is considered vita[l] to the legislation, and was favorably received by witnesses at the hearings." H. R. Rep. No. 805, 90th Cong., 1st Sess., 4 (1967); see S. Rep. No. 723, 90th Cong., 1st Sess., 4 (1967).