EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Appellant,

v.

The BALTIMORE AND OHIO RAIL-
ROAD COMPANY and The Chesapeake
and Ohio Railway Company, Appellees,

Equal Employment Advisory Council,
Amicus Curiae.

EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION, Appellee,

v.

The BALTIMORE AND OHIO RAIL-
ROAD COMPANY and The Chesapeake
and Ohio Railway Company, Appellants,

Equal Employment Advisory Council,
Amicus Curiae.

Nos. 79–1210, 79–1211.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 6, 1980.

Decided Sept. 23, 1980.

Thomas J. Allen, U. S. Dept. of Labor, Washington, D. C. (Marshall H. Harris, Regional Sol., Philadelphia, Pa., Carin Ann Clauss, Sol. of Labor, Donald S. Shires, Associate Sol., Lois G. Williams, U. S. Dept. of Labor, Washington, D. C., on brief), for appellant/cross–appellee.

N. Thompson Powers, Washington, D. C. (Ronald S. Cooper, Morgan D. Hodgson, Steptoe & Johnson, Washington, D.C., Joseph B. Geyer, Baltimore, Md., on brief), for appellees/cross–appellants.

Robert E. Williams, Douglas S. McDowell, Monte B. Lake, McGuiness & Williams, Washington, D. C., on brief, as amicus curiae.

Before BUTZNER, HALL and SPROUSE, Circuit Judges.

SPROUSE, Circuit Judge:

This is an appeal by the Secretary of Labor,[1] United States Department of Labor (Secretary), from a judgment of the district court in favor of the defendants, Baltimore and Ohio Railroad Company (B & O) and The Chesapeake and Ohio Railway Company (C & O), whose management has been consolidated since 1963 (hereinafter collectively railroad companies or companies). The Secretary brought the action contending the railroad companies violated the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq. (ADEA or the Act), by involuntarily terminating 142 employees based on their age–related entitlement to a pension and by amending the railroad companies' pension plans in 1972 to lower compulsory retirement age for other employees from age 65 to age 62. The district court, after a bench trial, found prima facie viola-

1. The Equal Employment Opportunity Commission was substituted as the Appellant–Cross–Appellee after the briefs were filed in this appeal. The enforcement responsibilities for the Age Discrimination in Employment Act of 1967 have been transferred to the Equal Employment Opportunity Commission.

tions of the Act. It held, however, that the companies' actions were a permissible exception under the Act and found for the defendant railroad companies. The Secretary appeals the finding of an exception and the companies cross–appeal the court's finding of prima facie violations. We agree there were prima facie violations of the Act but reverse the court's holding in favor of the companies as to the exception.

In 1971 a nationwide coal strike by the United Mine Workers Union precipitated a financial crisis for the companies, although their financial positions had declined uniformly for some years prior to that. As a step in resolving the financial crisis, the railroad companies determined, among other things, to reduce the size of the work force. First reduced was the number of employees subject to the collective bargaining agreements. The legality of that action is not involved in this appeal. The number of workers not subject to collective bargaining agreements was then reduced.

One hundred forty–two employees from the latter group were selected for involuntary retirement because they qualified for pension benefits. Their eligibility under both the C & O and B & O pension plans was based solely on age and years of service. They were retired commencing in October, 1971. At the time of termination they were either ages 60 to 62 with at least twenty years of service or ages 62 to 65 with at least ten years of service.

Management considered and rejected several alternatives to reducing the work force by the age–based method, including the possibility of terminating the youngest employees or the employees with least seniority. It is not clear why these alternatives were rejected. At one point in the testimony the companies' Senior Vice–President indicated that some younger people had skills with new technology which could not be developed by older people. The railroad companies did not attempt to rank their employees by performance, since such an attempt was not considered practical. The railroad companies next amended both their pension plans in 1972 to provide for involun-

tary retirement at age 62 to be effective in 1974.

The Secretary contends that the selection of the 142 employees for forced retirement by age category violated section 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1). He argues that the railroad companies again violated the age discrimination prohibition by amending their pension plans to require retirement at age 62. The district court found prima facie violations of the Act but found the railroad companies' actions justified under § 4(f)(2) of the Act. This subsection then permitted involuntary retirement based on age if done to observe the terms of a bona fide pension or retirement plan. We agree the companies' actions were prima facie violations of the Act. We do not agree that the forced retirements were based on the railroad companies' pension plans.

## I. THE ADEA

Relevant subsections of section 4 of the ADEA provide:

4(a)

It shall be unlawful for an employer–

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ....

29 U.S.C. § 623(a)(1).

4(f) (prior to its Congressional amendment in 1978)

It shall not be unlawful for an employer

. . .

(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this Act, except that no such employee benefit plan shall excuse the failure to hire any individual . . . ..

29 U.S.C. § 623(f)(2).

## II. THE PRIMA FACIE DISCRIMINATION

■ An employer is prima facie guilty of discrimination if its actions are based in

part on employees' ages. *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir. 1979). It is, of course, necessary that age be a determinative factor, but not the sole determining factor. *Loeb*, 600 F.2d at 1019; *Mary Carroll Smith v. University of North Carolina at Chapel Hill, John H. Schutz; Ruel W. Tyson, Jr.*, 632 F.2d 316 (4th Cir. 1980).

 The undisputed facts in this case show that the 142 employees were selected for forced retirement because of their age and time in service. The railroad companies' economic crisis precipitated the necessity for reducing their work force. That factor, however, provided no incentive for the layoff or retirement of this particular group: "but for" their age, they would not have been selected for retirement. This establishes a prima facie violation of the Act. *Loeb*, 600 F.2d at 1019. This reasoning applies with even greater force to the action of the companies reducing the mandatory retirement age from 65 to 62.

### III. THE PLANS

The C & O plan authorizes compulsory retirement at the normal retirement age of 65.[2] The B & O pension plan contained no provision concerning normal or "compulsory" retirement.[3]

Although there were no provisions in either company's plan for compulsory or involuntary retirement prior to age 65, there was uncontradicted evidence that the railroad companies had, in the past, involuntarily terminated some such employees and granted them pension benefits in accordance with the terms of the plans. Mr. Clarke, the Vice–President of the railroad companies in charge of the law department, testified that past terminations were based on "an inherent right of management in managing the business–In managing personnel. It has nothing to do with the plan."

He reiterated, "[t]he company has that right irrespective of the plan." The President of the railroad companies and other officials gave similar testimony as to management rights.

### IV. COMPANIES' ACTIONS WERE NOT BASED ON PENSION PLANS

#### A. THE INVOLUNTARY RETIREMENT OF 142 EMPLOYEES IN 1972.

 The Secretary, by showing the involuntary retirement of the 142 individual employees because of their age and pension entitlement, proved a prima facie case of age discrimination under the Act. *Loeb, supra; Mary Carroll Smith, supra; Price v. Maryland Casualty Co.*, 561 F.2d 609 (5th Cir. 1977). It then became the railroad companies' burden to successfully provide a 4(f)(2) defense. They were required to show: (1) that the involuntary retirement was to observe the terms of a (2) bona fide pension plan and that (3) the plan is not a subterfuge to evade the purposes of the Act.

Neither the C & O nor the B & O pension plans contained provisions allowing the companies to involuntarily retire employees under the age of 65. The C & O plan provides that the "normal" retirement age is 65. The B & O plan is silent in this respect, but "Highlights", published in connection with the plan, indicates that the normal retirement age is also 65 for that plan. It would be extremely difficult, therefore, to conclude that the railroad companies involuntarily retired the involved employees prior to age 65 by observing the terms of a bona fide pension plan.

The railroad companies concede there is no explicit language in the plans indicating a company prerogative to involuntarily retire employees. They contend, however, that the railroad companies' right to do so

---

2. The C & O plan provides in part:
 Compulsory Retirement. In order to qualify for a retirement allowance under the Supplemental Plan, a member shall retire from service not later than the last day of the calendar month in which he attains age 65,

hereinafter referred to as the "normal retirement date".

3. A published B & O document entitled "Highlights", however, included information under a heading entitled "Retirement Dates" which referred to age 65 as "normal retirement".

has become an unwritten part of the plans by the past practice of unilaterally terminating employees and providing them pensions if they were eligible at the time of termination. There is nothing in the record, however, showing either the reasons for, or the frequency of, the various terminations. The President of the railroad companies, the Vice–President in charge of the legal department, and other officials categorically assert that such right of involuntary termination is an inherent right of management having nothing to do with the pension plans.

■ The record contains no specific examples of these terminations, but it can be assumed they were for reasons as varied as the world of employer–employee relationships. It is undisputed that all these previous terminations were both unrelated to the pension plans and made under company authority exclusive of the pension plans. If such discharged employees were entitled to a pension, the right was earned by service to the railroad companies and was vested despite discharge, not because of it. The mere allowance of a pension at the time of discharge by virtue of broad management policies is not a defense inherent in the scheme of section 4(f)(2). A successful 4(f)(2) defense requires that the involuntary termination be pursuant to the pension plan's design–not to a discretionary act of management.

The Supreme Court, in *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), concluded that United had observed the terms of a concededly bona fide pension plan in retiring an employee at the "normal retirement" age of 60. The Supreme Court adopted the Fourth Circuit's reasoning that, due to United's past practice of involuntarily retiring individuals under the plan at age 60, the term "normal retirement" meant involuntary retirement at age 60. *Id.* at 196, 98 S.Ct. at 447. Similarly, the Court of Appeals for the Third Circuit, in *Zinger v. Blanchette*, 549 F.2d 901 (3rd Cir. 1977), *cert. denied*, 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978), (quoted favorably by

the Supreme Court in *McMann*), considered a system which explicitly provided for the involuntary retirement of any employee between the ages 60 and 65 at the company's option. *Zinger* held that the company was justified in retiring such employees under the terms of its retirement plan. The Court of Appeals for the Sixth Circuit in *Thompson v. Chrysler Corp.*, 569 F.2d 989 (6th Cir. 1978), likewise considered and allowed retirement pursuant to a plan containing specific involuntary retirement provisions. *See also Brennan v. Taft Broadcasting Co.*, 500 F.2d 212 (5th Cir. 1974) (allowing a subsection 4(f)(2) defense where the involved plan contained an explicit compulsory retirement at age 60). In all these cases the plans provided for involuntary retirement prior to the age of 65.

■ The railroad companies maintained pension plans for many years–paying substantial benefits. The plans are clearly bona fide. There was no authority, however, in the plans to involuntarily retire employees prior to the age of 65. The railroad companies' actions in forcing retirement on the 142 individual employees, therefore, could not have been to observe the terms of the plans. The plans, for this reason, provide no basis for a section 4(f)(2) defense.

■ The railroad companies assert that they relied on the Labor Department's published opinions in assuming the legality of the involuntary retirements. They contend, therefore, that the Secretary's complaint on behalf of the 142 employees is barred by section 7(e) of the ADEA, 29 U.S.C. § 626(e), which incorporates section 10 of the Portal–to–Portal Act of 1947, 29 U.S.C. § 259(a). Section 10(a) provides in part:

In any action or proceeding . . . no employer shall be subject to any liability or punishment . . . if he pleads and proves that the act or omission complained of was in good faith in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation, of the agency of the United States . . . . .

Railroad company officials insist they relied on several Wage–Hour opinion letters and an ADEA Interpretive Bulletin, 29 C.F.R. § 860.110 (1978). This bulletin states:

(a) [T]he Act authorizes involuntary retirement irrespective of age, provided that such retirement is pursuant to the terms of a retirement or pension plan meeting the requirements of section 4(f)(2). The fact that an employer may decide to permit certain employees to continue working beyond the age stipulated in the formal retirement program does not, in and of itself, render an otherwise bona fide plan invalid insofar, as the exception provided in section 4(f)(2) is concerned.

(b) This exception does not apply to the involuntary retirement before 65 of employees who are not participants in the employer's retirement or pension program.

In *Pilkenton v. Applachian Regional Hospitals, Inc.*, 336 F.Supp. 334, 340 (W.D.Va. 1971), it was said that "in order for an employer to assert that it relied on and conformed to an administrative bulletin, the bulletin must be specific enough to cover the particular employment situation," and, in *Clifton D. Mayhew, Inc. v. Wirtz*, 413 F.2d 658 (4th Cir. 1969), this Court held that an employer, to take advantage of section 10(a), must prove a good faith reliance by objective evidence. The interpretive bulletin, on which the defendant railroad companies claim reliance, refers to the terms of the pension plan itself. The bulletin instructs that involuntary retirement irrespective of age is permissible, if pursuant to the terms of a pension plan. Assuming, as we have here held, that the railroad companies' plans contain no such authorization, it is circular reasoning to argue that the railroad companies could involuntarily retire protected employees on the basis of the Secretary's interpretive bulletin directing them to examine their plans. The interpretive bulletin does not have the specificity required by *Pilkenton*, nor is there objective evidence that the railroad companies relied on it in good faith.

### B. THE COMPANIES' 1972 PENSION PLANS PROVIDING FOR INVOLUNTARY RETIREMENT AT AGE 62.

The railroad companies' amendments to their pension plans made in October, 1972, and effective January 1, 1974, reduce the mandatory retirement age from age 65 to age 62. Since 1974 some employees have been involuntarily retired at age 62 under the amended plan. Although also governed by the Act, the railroad companies' 4(f)(2) defense of those amendments fails–but under a different application of the statute.

Subsequent to the 1972 changes in the railroad companies' plans, Congress amended section 4(f)(2) to explicitly prohibit its provisions from being utilized as a defense to involuntary retirement of protected individuals. The amendment was effective from enactment on April 6, 1978, and provides:

(f) It shall not be unlawful for an employer . . .

(2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this Act, except that no such employee benefit plan shall excuse the failure to hire any individual, *and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 12(a) of this Act [29 U.S.C. § 631(a)] because of the age of such individual.*

29 U.S.C. § 623(f)(2) (1978 amending language emphasized).

The Secretary contends this Congressional amendment is applicable to the railroad companies' actions in 1972. We do not decide this but, even leaving aside the question of the possible retroactivity of the 1978 amendment to section 4(f)(2), the 4(f)(2) defense of the amended retirement plan is unavailing–the railroad companies' 1972 amendments to the plans, unlike the original plans and previous amendments, is

a "subterfuge to evade the purpose of this chapter."

The testimony was unequivocal that the 1971 coal strike had a devastating impact on the railroad companies, precipitating drastic action to reduce the number of employees. Terminated were management employees, inefficient employees, and then those entitled to pension benefits because of their age and service. Following quickly on the heels of those actions, the Board of Directors approved the amendment to effect continued forced retirements based on age in October 1972. The President of the railroad companies testified that he had long considered reducing the number of employees by lowering the mandatory retirement age to age 62.

There is certainly nothing sinister about a chief executive's design to "cut the cloth to fit the pattern;" drastic action by the railroad companies were certainly required. The ADEA, however, prohibits personnel reduction on the basis of the age of individuals in the protected group. Section 2(b) of the Act states its purposes:

> to promote employment of older persons based on their ability rather than age; to prohibit arbitrary age discrimination in employment; to help employers and workers find ways of meeting problems arising from the impact of age on employment.

29 U.S.C. § 621(b). Under the circumstances in which the pension plans of the railroad companies were amended, it is clear that the amendments were designed to evade the ADEA's goals as expressed in § 2(b).

The railroad companies assert that their actions in amending the plans were also justified under section 10(a) of the Portal-to-Portal Act. Vice-President Clarke, in charge of the law department, apparently read administrative interpretations of the Act prior to the adoption of the amendments reducing the mandatory retirement age from age 65 to 62. The material, including a 1968 opinion letter of the Wage-Hour Administrator, is generally supportive of the railroad companies' position that the action did not violate the ADEA. Clarke

indicated his opinion as to the legality of the railroad companies' actions was based on his readings of these interpretations, his conversation with a non-lawyer employee, and on his own interpretation of the law. He apparently did not express this opinion to those officers considering the amendments, but indicated his approval by not objecting to the amendments.

The requisite for a defense under section 10(a) is that it be made "in good faith and in conformity with and in reliance on any written administrative regulation, order, ruling, approval, or interpretation ...."

The first specific consideration by a company official to amend the pension plan by reducing the mandatory retirement age from 65 to 62 was by Vice-President Clarke in May, 1972. In December, 1971, the Department of Labor had initiated an investigation of the railroad companies' practice of involuntarily retiring members of the ADEA-protected group of 142 individuals prior to the age of 65. The railroad companies were aware of this investigation months prior to the first consideration of possible amendments. In March, 1972, and again prior to consideration of the amendments, the Secretary's representative advised railroad officials of the results of the investigation: the companies were in violation of the ADEA. Yet only a few months afterward—in October, 1972—the Board of Directors finally approved the amendment to the plan.

In light of this sequence of events indicating the railroad companies' specific knowledge of the discriminatory character of their conduct, they have not proved a section 10(a) defense. They have not established, by objective evidence, that good faith reliance on an administrative interpretation as required by *Clifton D. Mayhew, Inc., supra. See also Marshall v. Emersons Ltd.,* 593 F.2d 565 (4th Cir. 1979).

That portion of the district court's decision finding prima facie violations is affirmed. The decision finding the violations excused under section 4(f)(2) is reversed and the case is remanded for action consistent with the views of this opinion.

AFFIRMED IN PART; REVERSED IN PART.