943 F.2d 996
 56 Fair Empl.Prac.Cas. (BNA) 1183,
57 Empl. Prac. Dec. P 40,951, 60 USLW 2208,
14 Employee Benefits Cas. 1120
 AMERICAN ASSOCIATION OF RETIRED PERSONS; Margaret J.
Jashni; Marigo K. Merrick; Howard E. Moore, et
al., Plaintiffs-Appellees,
v.
FARMERS GROUP, INC., and its affiliated companies; Farmers
New World Life Insurance Company; the Ohio State Life
Insurance Company; Investors Guaranty Life Insurance
Company, et al., Defendants-Appellants.
 No. 90-55872.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted July 11, 1991.
Decided Aug. 20, 1991.
 
 Charles F. Barker, John M. Temple, Sheppard, Mullin, Richter & Hampton, Thomas A. Hoffman, Early, Maslach, Nutt & Peterson, Los Angeles, Cal., for defendants-appellants.
 Raymond C. Fay, Thomas R. Gibbon, Christopher G. Mackaronis, Bell, Boyd & Lloyd, Steven Zaleznick, Cathy Ventrell-Monsees, American Ass'n of Retired Persons, Washington, D.C., for plaintiffs-appellees.
 Donald R. Livingston, Acting Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, Lorraine C. Davis, Asst. Gen. Counsel, Robert J. Gregory, Washington, D.C., for the E.E.O.C., as amicus curiae.
 Appeal from the United States District Court for the Central District of California.
 Before REINHARDT and FERNANDEZ, Circuit Judges, and CROCKER, District Judge.*
 FERNANDEZ, Circuit Judge:
 
 
 1
 Farmers Group, Inc., its affiliated companies, its pension plan trust, and its profit sharing trust (Farmers) appeal the district court's grant of summary judgment in favor of American Association of Retired Persons (AARP), and a number of current or former employees of Farmers, all of whom are over age 65 (individual appellees). The district court determined that Farmers willfully violated the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, et seq., because it denied profit sharing contributions and forfeiture allocations and pension plan credits to employees over the age of 65. The court also held that denying profit sharing contributions and forfeiture allocations and actuarial increases to pension plan benefits to these employees violated the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001, et seq. Farmers also challenges the district court's denial of Farmers' motion to dismiss the complaint as to those appellees who joined the action after the Equal Employment Opportunity Commission (EEOC) filed a complaint against Farmers challenging the profit sharing plan provisions. Further, Farmers challenges the district court's determination of damages. We affirm.
 
 BACKGROUND FACTS
 
 2
 At the time of filing the complaint, the individual appellees were former and current employees of Farmers. Each worked beyond the age of 65. They and AARP (appellees) claimed that Farmers had violated the ADEA, ERISA and various state statutes because it had denied pension plan credits and profit sharing contributions and forfeiture allocations to employees over the age of 65 from January 1, 1979 and was continuing to do so.[1] Farmers has had a profit sharing plan and a pension plan in place since long before the enactment of the ADEA in 1967 and ERISA in 1974. The plans have been modified a number of times since their inception. The specific amendments relevant to this action will be discussed in detail in later portions of this opinion.
 
 
 3
 Farmers' profit sharing plan allocates company contributions to a fund in which each employee who meets the time of service and minimum age requirements set forth in the plan is permitted to participate. The plan is a defined contribution plan, rather than a defined benefit plan.[2] Each employee's individual account receives allocations based on a percentage of that person's earnings. In addition to direct contributions, the plan provides that forfeitures[3] are redistributed among vested employee accounts. Employees automatically receive a 20% distribution of their profit sharing account every year after full vesting, unless they irrevocably elect to leave the balance in their account until retirement.[4] Over 90% of employees elect to receive the annual distribution, rather than defer receipt until retirement. The challenged provision of the profit sharing plan provided:
 
 
 4
 A Participant who remains on the payroll of any of the Companies after normal retirement date shall not be credited with contributions provided by Article III nor be credited for forfeitures under Article VI.
 
 
 5
 The plan also prohibited the distribution of account balances to employees aged 65 and older until actual retirement.
 
 
 6
 The plaintiffs challenged the pension plan provision which provided that employees who continued to work after reaching age 65 would not receive additional service or salary credits for purposes of calculating their monthly retirement benefit.[5] An employee was not permitted to begin collecting retirement benefits until actual retirement, and no actuarial increase was provided for the period during which the employee continued to work.
 
 
 7
 Farmers sought dismissal of the claims of the 24 plaintiffs who opted into the suit after the EEOC filed an action alleging that Farmers' profit sharing plan violated the ADEA. It also sought dismissal of the state law claims, arguing that they were preempted by ERISA. The district court denied Farmers' motions.
 
 
 8
 All parties moved for summary judgment. On September 22, 1988, the district court granted appellees' motion for summary judgment on liability under the ADEA and ERISA. See American Ass'n of Retired Persons v. Farmers Group, Inc., 700 F.Supp. 1052 (C.D.Cal.1988). After the Supreme Court decision in P.E.R.S. v. Betts, 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989), the district court reconsidered its earlier rulings, issued an amended statement of uncontroverted facts and conclusions of law, and again found Farmers liable. The district court later granted appellees' motion for summary judgment on the issue of damages. Farmers timely appealed.
 
 JURISDICTION AND STANDARD OF REVIEW
 
 9
 The district court had jurisdiction under 29 U.S.C. § 626(c)(1), and 29 U.S.C. § 1132(e)(1). We have jurisdiction under 28 U.S.C. § 1291.
 
 
 10
 We review the district court's grant of summary judgment de novo. E.E.O.C. v. County of Orange, 837 F.2d 420, 421 (9th Cir.1988). "We must determine, viewing the evidence in the light most favorable to the nonmoving party ..., whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." Id.
 
 DISCUSSION
 
 11
 A. The ADEA Claims.
 
 
 12
 The district court held that Farmers' denial of contributions and forfeiture allocations with respect to the profit sharing plan, and its denial of pension plan accruals violated the ADEA. It further held that the purpose of the plan provisions was to discourage people from working past the age of 65, and that each plan was a subterfuge to evade the purposes of the ADEA. The court found that each plan discriminated against employees who continued to work past age 65 in a non-fringe benefit aspect of their employment. The court further held that the profit sharing plan was a subterfuge because it decreased the compensation of employees over age 65.
 
 
 13
 Section 4(a)(1) of the ADEA makes it illegal for an employer "to fail or refuse to hire or to discharge any [protected] individual or otherwise discriminate against any [protected] individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age...." 29 U.S.C. § 623(a)(1). However, the statute further provides in section 4(f)(2) that it "shall not be unlawful for an employer ... to observe the terms of ... any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter...." 29 U.S.C. § 623(f)(2).
 
 
 14
 The Supreme Court has held that section 4(f)(2) requires a plaintiff to prove that a discriminatory provision "was intended to serve the purpose of discriminating in some non-fringe-benefit aspect of the employment relation." Betts, 492 U.S. at 181, 109 S.Ct. at 2868.[6] It thus modifies the elements of a plaintiff's prima facie case, id., by requiring that the plaintiff at least raise an inference of discriminatory intent at the outset.[7] Thus, in addition to showing that a challenged plan provision is discriminatory on its face, the plaintiff must offer evidence sufficient to raise an inference that the employer adopted the provision in an attempt to avoid the prohibitions of the ADEA.
 
 
 15
 If a plan is not an "employee benefit plan" within the meaning of section 4(f)(2), the plaintiff need not show that the challenged provision is a subterfuge. The Supreme Court has not determined "the precise meaning of the phrase 'any bona fide employee benefit plan such as a retirement, pension, or insurance plan.' " Betts, 492 U.S. at 174 n. 6, 109 S.Ct. at 2865 n. 6. But, the Court has held that the phrase could not be limited to "plans in which all age-based reductions in benefits are justified by age-related cost considerations."[8] Id. at 175, 109 S.Ct. at 2865. With these general rules in mind, we consider Farmers' pension and profit sharing plans in turn.
 
 
 16
 1. The Pension Plan.
 
 
 17
 The uncontroverted facts show that the explicit pension plan provisions denying accruals of service and salary credits to employees over age 65 were first adopted on August 4, 1978. The 1976 version of the plan did not include any such provisions. Section 5.8 of that plan did contemplate the possibility of continued employment past age 65, since it provided that if an employee continued employment after the normal retirement age , payment of retirement benefits would not be postponed. There was no provision to increase that pension while the person continued to work. The 1978 amendments explicitly changed section 5.8 to provide that no benefit would be paid to a continuing or reemployed employee. They also precluded any actuarial increases in the interim between age 65 and actual retirement. Farmers' argument that the plan provisions merely continued in effect its prior practice is unavailing with respect to this plan, since it contradicts the plan's own provisions. Concededly, Farmers required employees to retire at age 65. Thus, as a practical matter, few or none of its employees had worked while receiving a pension. But the plan did not preclude that possibility if an employee did work beyond normal retirement age, for that was clearly contemplated by the provision allowing simultaneous employment and collection of retirement benefits prior to 1978.
 
 
 18
 In response to the ADEA amendments in 1978, Farmers held numerous internal discussions regarding possible changes to the pension and profit sharing plans. Appellees offered evidence, including the deposition testimony of Farmers' Vice-President of Personnel, David Darvin, to the effect that in the course of those discussions, Farmers considered employee morale. Darvin believed that younger employees' morale might be negatively affected if employees over 65 received the same profit sharing and pension contributions and credits, because younger employees' "career growth and promotional opportunities are limited by others who stay on." There was similar testimony from Rocco DiFonso, who, until at least 1981, was Chairman of the Committee which served as the profit sharing plan administrator. One of the appellees, Virginia Gould, submitted a declaration stating that she was told by a personnel specialist and a personnel manager that Farmers cut off profit sharing and pension benefits at age 65 "because we want you to quit."[9] While Farmers grumbles about the strength of the evidence, it did not place conflicting evidence before the district court at the time of the summary judgment motion.
 
 
 19
 When Farmers amended the plan to preclude pension payments, actuarial increases, and credits, the concatenation of those provisions constituted a substantial change in the plan as it had theretofore existed. Thus, even though the plan itself existed prior to the enactment of the ADEA, the challenged provisions were adopted afterward, and were not automatically exempt from scrutiny under section 4(f)(2). Betts, 492 U.S. at 169, 109 S.Ct. at 2862. The provisions discriminate on their face against employees over age 65. Their adoption after the ADEA was enacted, together with the evidence discussed above, raises an inference of discriminatory intent. Farmers asserts that the amendments were necessary to comply with ERISA. However, the specific denial of post-65 service credits was not necessary to comply with ERISA--the plan needed only to define "service hours" and other relevant terms; there was no need to define them so as to discriminate against employees over age 65. See ERISA § 402 (establishment of plan); 29 U.S.C. § 1102 (same); ERISA §§ 202, 1011 (minimum participation standards); 26 U.S.C. § 410 (same); 29 U.S.C. § 1052 (same).
 
 
 20
 Farmers offers no legitimate, non-discriminatory reason for the denial of post-65 service and salary credits and its change in policy with respect to employment past age 65 and simultaneous collection of retirement benefits. Rather, the evidence supports a determination that, as a business policy, Farmers wanted to get rid of older workers and that the pension plan change was one way to help accomplish that goal. Whatever some might think about the efficacy of that policy from a business efficiency standpoint, our society has set its face against it. It is no longer permitted by law. The district court was justified in finding that the plan amendments were a subterfuge to evade the ADEA. Summary judgment was appropriate on this issue.
 
 
 21
 2. The Profit Sharing Plan.
 
 
 22
 The district court determined that Section 7.4 of the Profit Sharing Plan, which specifies that employees who continue to work after age 65 will not receive contributions or forfeitures, did not exist prior to 1976. The court further found that Farmers modified section 7.4 in 1982 to permit a lump sum distribution of a participant's account at age 65 no matter when the employee retired. The previous version of 7.4 did not permit distribution of the account until an employee actually retired.
 
 
 23
 While as a technical matter, section 7.4 did not exist prior to 1976, the profit sharing plan did previously contain another section which specified that an employee who "remains on the payroll ... after ... normal retirement age shall [not] continue as a Participant, or become a Participant in the Plan." This provision or its equivalent existed in the plan from at least December 1965. Thus, it predated the ADEA. The 1976 modifications had the effect of making employees age 65 and over "participants" in the plan, but denied them credits for contributions and forfeitures. Prior to 1976, those employees were not participants and only participants received credit for contributions and forfeitures. Thus, the 1976 plan changed the definition of the term "participant"--before 1976, all "participants" received allocations of contributions and forfeitures, but some classes of employees were excluded as participants. After 1976, all employees who met the minimum employment term and age were "participants," but the plan divided the employee participants into two classes--those under age 65 and those over age 65. However, the effect of the 1976 amendment was not different from earlier provisions of the plan.
 
 
 24
 We recognize at the outset that the profit sharing plan's denial of contributions and forfeiture allocations to employees over 65 did not violate the ADEA when the plan was amended in 1976 to change the definition of participant, even if that amendment was made with discriminatory intent. Until the ADEA was amended in 1978, it only applied to persons under age 65. See 29 U.S.C. § 631(a) (1967) ("The prohibitions in this chapter shall be limited to individuals who are at least 40 years of age but less than 65 years of age"). The 1978 amendment extended the ADEA protections to persons under age 70, and also prohibited mandatory retirement of persons under age 70[10], even if called for by a bona fide employee benefit plan. 29 U.S.C. § 631(a); 29 U.S.C. § 623(f)(2).
 
 
 25
 Farmers' Profit Sharing Plan is a hybrid. It has aspects of both a retirement plan and immediate compensation. The way the plan is structured and treated by Farmers' employees, it provides immediate compensation once an employee has been with the company for five years.[11] To that extent, while the plan may for some purposes be an "employee benefit plan," it is wages, too. It is designed to compensate for work actually performed by an employee rather than as a reward for longevity. Cf. Raypole v. Chemi-Trol Chemical Co., Inc., 754 F.2d 169, 172-75 (6th Cir.1985) (distinguishing between retirement and deferred compensation profit sharing plans under Vietnam Era Veterans' Readjustment Assistance Act and deciding that plan in question was, as a whole, one for compensation). See also E.E.O.C. v. Westinghouse Elec. Corp., 925 F.2d 619, 626 (3d Cir.1991). In that sense, Farmers' profit sharing plan is not an employee benefit plan under section 4(f)(2), unless all wages are treated as "employee benefits," which can hardly be the meaning of the statute. As such, at the very least the plan does not wholly fall within the section 4(f)(2) exception. Cf. 29 C.F.R. § 860.120(b) (1970) (former Department of Labor regulation suggesting that profit sharing plans not within section 4(f)(2) exception unless essential purpose is to provide retirement benefits).
 
 
 26
 As a result, when the 1978 amendment to the ADEA became effective on January 1, 1979, the profit sharing plan began to violate the ADEA by denying wages to employees over age 65, solely on the basis of age. Just as Farmers could no longer compel its employees to retire at age 65, it could no longer reduce their compensation at age 65, even if such a result was permissible before 1979. That reduction discriminates in a "non-fringe-benefit aspect of the employment relation." Betts, 492 U.S. at 181, 109 S.Ct. at 2868. Farmers offered no evidence of a legitimate, non-discriminatory reason for the payment of lower compensation to employees over age 65. Indeed, as we have already pointed out, the evidence was quite to the contrary. The provision is a per se violation of the ADEA. Thurston, 469 U.S. at 121, 105 S.Ct. at 621.
 
 
 27
 Farmers has earnestly argued that the profit sharing plan is really a retirement plan which falls within the section 4(f)(2) exemption. It does, certainly, have something of that aspect, because a continuing employee cannot draw down the whole of an account at any time.[12] No matter how small the account gets, eighty percent is still left after the employee exercises the withdrawal right.[13] However, to the extent that the profit sharing plan is also a retirement plan, then we hold that it must be considered to be part of an integrated retirement package offered by Farmers to its employees. In fact, Farmers itself characterized the two plans as a "retirement program" when it sought summary judgment before the district court. The pension plan was first adopted in 1943, and in 1948 the additional retirement benefits of the profit sharing plan were made available to employees. Working together the two plans gave the employees three things that ordinary wages alone did not give them: an increase in salary after five years, a defined benefit retirement plan, and, in part, a defined contribution retirement plan. Cf. E.E.O.C. v. Borden's Inc., 724 F.2d 1390, 1396-97 (9th Cir.1984), overruled on other grounds, Betts, 492 U.S. at 173-75, 109 S.Ct. at 2864-65; 29 C.F.R. § 860.120(f)(2) (1979) (discussing "benefit package" approach to compliance with section 4(f)(2) to permit reductions in some benefits offset by increase or no change in other benefits, but stating that such an approach is not applicable to retirement plans, at least as to offsetting retirement and non-retirement benefits).
 
 
 28
 In other words, to the extent that the profit sharing plan is a retirement plan, it supplements[14] and complements the pension plan so that a change in one plan substantially affects the individual employee's entire retirement package. We must assume that an employee would review that whole package when determining what benefits would be available upon retirement. It goes without saying that an employer, like Farmers, treats benefits in a similar fashion. That is to say, a person contemplating his benefits from the company would, as no doubt intended, consider his retirement benefits to be a mixture of the benefits provided by these two plans.
 
 
 29
 Viewing the plans as an integrated retirement package, we conclude that the 1978 amendment to the pension plan worked a significant change in Farmers' retirement package. We are bolstered in this conclusion by the fact that Farmers, in response to ERISA and the ADEA, considered both plans together and decided to do what it could to force people to retire at its chosen retirement age. It made the entire benefits package as undesirable as possible for persons over age 65. It had already done so as far as the profit sharing plan component was concerned; it completed the task by changing the pension plan component in 1978. We would thus blink at reality if we held that Farmers could isolate the plans from one another in an attempt to avoid liability, simply because Farmers did not specifically change the profit sharing plan in 1978. It is clear that the discrimination against older employees from 1978 forward was carried out by the operation of both plans together. Thus, the profit sharing plan is not insulated from challenge simply because similar provisions existed in plans which predated the ADEA's application to those over 65 years of age. See Robinson v. County of Fresno, 882 F.2d 444 (9th Cir.1989). See also, United Air Lines, Inc. v. McMann, 434 U.S. 192, 203, 98 S.Ct. 444, 450, 54 L.Ed.2d 402 (1977).
 
 
 30
 Farmers now contends that there was no intent to force or encourage employees over age 65 to retire. Yet it offered nothing to contradict the testimony of its own employees that Farmers was motivated by its concern that younger employees would lack advancement opportunities if more older employees stayed on. And Farmers has not offered any other plausible reason--or any non-discriminatory reason at all--for its policy of denying credits for contributions and allocations to employees over age 65. There was no showing that provision of those benefits would have imposed additional costs on Farmers.[15] In the face of direct evidence of discrimination and discriminatory intent, Farmers has failed to offer evidence of a legitimate, non-discriminatory reason for the challenged provisions. The provisions discriminate in a "non-fringe-benefit aspect of the employment relation," Betts, 492 U.S. at 181, 109 S.Ct. at 2868, by discouraging persons over age 65 from remaining in Farmers' employ. The district court did not err in concluding that they were a subterfuge to evade the purposes of the act.
 
 
 31
 B. Willfulness Under The ADEA.
 
 
 32
 An employer's violation of the ADEA is willful where the " 'employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA.' " Thurston, 469 U.S. at 128, 105 S.Ct. at 625. There is no question that the ADEA prohibited a wage differential based solely on the age of the employee. In addition, though the law surrounding the propriety of Farmers' profit sharing plan provisions might have been somewhat unsettled, the Department of Labor had issued a regulation to the effect that most profit sharing plans were not included within the purview of section 4(f)(2). 29 C.F.R. § 860.120(b) (1970). Moreover, even though section 4(f)(2) was determined not to be a "cost-justification" rule by the Betts Court, that does not mean that a provision which was adopted as a subterfuge would be permissible under the ADEA.
 
 
 33
 The district court's finding of willfulness is justified. Farmers sought legal advice about the legality of the challenged provisions. Its in-house and outside attorneys advised it that the provisions were not authorized under the ADEA or the Department of Labor interpretation. But most importantly, the evidence shows that Farmers, without waiting to get the legal advice it sought, made a decision in 1978 to continue the provisions in effect, and even to enhance their bite by taking away benefits in the other part of the retirement package--the pension plan. In addition, Farmers intended to discriminate against older employees by the provisions of its plans. Its attempt to secure legal advice to justify, in a post hoc manner, its decision in no way suggests that the ADEA violation was not willful. It only bespeaks an attempt to obtain comfort for a course of conduct already decided upon. When that comfort was slow in coming, Farmers did not deviate from its predecided course. This satisfies the "reckless disregard" standard of Thurston, not because the law was entirely clear, but because Farmers acted without bothering to find out what the law required.
 
 
 34
 C. The Joinder of Additional Appellees.
 
 
 35
 Farmers contends that many of the individual appellees should be excluded from recovery because they joined the litigation at too late a date. We disagree.
 
 
 36
 The ADEA permits enforcement by an action filed by or on behalf of aggrieved employees. 29 U.S.C. § 626(b). Section 626(b) provides that the procedures of 29 U.S.C. § 216(b) and (c), inter alia, shall be used to enforce the provisions of the ADEA. Section 216(b) provides as follows:
 
 
 37
 An action to recover the liability prescribed ... may be maintained against any employer ... in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated.... The right provided by this subsection to bring an action by or on behalf of any employee and the right of any employee to become a party plaintiff to any such action shall terminate upon the filing of a complaint by the [EEOC] in an action ... in which (1) restraint is sought of any further delay in the payment of unpaid ... compensation....
 
 
 38
 Id. See also 29 U.S.C. § 216(c) (employee's right to become party to private action terminates when Secretary [EEOC] brings action for recovery of unpaid amounts); 29 U.S.C. § 626(b) and (c) (right to bring action terminates upon EEOC's commencement of action to enforce the right of employee under ADEA).
 
 
 39
 Under these statutes, the right of the additional parties to become plaintiffs, at least as to the claim that the profit sharing plan provisions violated the ADEA[16], would have terminated when the EEOC filed its action on September 30, 1986, if the EEOC had sought recovery of the amounts owed to them by Farmers. However, the EEOC's initial complaint sought only injunctive relief. Though the complaint purports to sue on behalf of the class of employees to which the individual appellees belong, it neither sought damages for lost benefits on their behalf, nor named any employee on whose behalf relief was or would be sought. It was not until October 20, 1987 that the EEOC sought to amend its complaint to request that Farmers' employees be awarded damages for the lost benefits caused by Farmers' unlawful policy. At that time it, in apparent recognition of the propriety of what had occurred in this action, failed to name the individual appellees, save two who were inadvertently named in the EEOC amendments.
 
 
 40
 We hold that the EEOC, by filing an action seeking only injunctive relief, did not foreclose injured employees from joining in an ongoing lawsuit which sought relief that the EEOC chose not to pursue. We recognize that Congress wished to give the EEOC primary enforcement power under the ADEA. See E.E.O.C. v. Pan American World Airways, Inc., 897 F.2d 1499, 1507 (9th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 55, 112 L.Ed.2d 31 (1990). That, however, does not require us to conclude that Congress intended to preclude private litigants from seeking damages when the EEOC has, in effect, eschewed doing so.
 
 
 41
 Pan American does not require a different result. While at first glance its broad language might seem to foreclose the result we reach here, that case involved individuals seeking to intervene in an action brought by the EEOC because their right to damages from their former employer arising out of the same wrongful conduct was being terminated in the suit. The individuals had not taken advantage of opportunities to be included in the EEOC action. They were not seeking relief different from that sought by the EEOC. Furthermore, they sought to interfere with the EEOC's handling of the litigation it had brought and settled. In the case at hand, the EEOC quite clearly coordinated its later brought action with that of the appellees. In fact, it submitted an amicus brief to us in which it urged the merits of appellees action. At no point did it assert that its dominant role in the enforcement of the ADEA was being undermined by this action. Rather, this case shows a commendable coordination of efforts.
 
 
 42
 The district court's decision to permit additional plaintiffs to opt into the private suit after the EEOC filing was not in error.
 
 
 43
 D. Damages.
 
 
 44
 The ADEA permits the court to grant "such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments ... enforcing the liability for amounts" of unpaid wages and benefits. 29 U.S.C. § 626(b). The statute does not purport to limit an employee to having an account properly credited (equitable relief) rather than receiving a damage award (legal relief). The statute also authorizes liquidated damages awards for willful violations.
 
 
 45
 Farmers contends that the district court erred when it awarded liquidated damages to three plaintiffs who had not yet withdrawn any amounts from their profit sharing plans. Farmers contends that liquidated damages awards are only to be applied to "pecuniary loss" suffered by the employee. It cites Brown v. M & M/Mars, 883 F.2d 505, 515 (7th Cir.1989) for this proposition. In Brown, the court held that an employee could not receive liquidated damages for pension benefits which he had not lost.[17]
 
 
 46
 To the extent that the profit sharing plan here is part of compensation, Farmers' argument fails. Farmers would be liable for liquidated damages just as if it had not paid wages to the employees. To the extent that the profit sharing plan is part of the retirement package, the district court's judgment in this respect should also stand. The fortuitous fact that the employees chose not to withdraw the fully vested amounts in their profit sharing plans at the time they were eligible to do so does not relieve Farmers of liability for its willful violation of the ADEA. Unlike the employer in Brown, Farmers has not pledged to make the proper credits to the individual appellees' accounts. The district court was not asked to order Farmers to do so, but instead was asked to award damages. It exercised its discretion to do so, and its award of liquidated damages to appellees was not an abuse of discretion.
 
 
 47
 Farmers also contends that the district court erred in awarding the previously retired appellees the present value of future pension losses rather than ordering Farmers to adjust their pension payments on a monthly basis.[18] The district court's order was entirely proper. See Kelly v. American Standard, Inc., 640 F.2d 974, 986 n. 20 (9th Cir.1981); Loeb v. Textron, Inc., 600 F.2d 1003, 1021 (1st Cir.1979), disapproved on other grounds, Thurston, 469 U.S. at 126 n. 19, 105 S.Ct. at 624 n. 19.
 
 CONCLUSION
 
 48
 Over the many years since the ADEA was first enacted, Farmers has been resolute in its opposition to the policies and purposes that animated that legislation. It embraced every opportunity to restrict benefits for older workers and ultimately went too far. As a result, it violated the ADEA by depriving older workers of the benefits to which they would otherwise have been entitled and by doing so for the purpose of driving them into retirement.[19] Therefore, despite Farmers' jeremiads and febrile arguments it must now make the individual appellees whole.
 
 
 49
 AFFIRMED.
 
 
 
 *
 The Honorable Myron D. Crocker, Senior United States District Judge for the Eastern District of California, sitting by designation
 
 
 [1]
 The district court awarded damages from January 1, 1979 to June 1, 1990. Unless otherwise specifically stated, all references to the plan provisions and to actions of the parties refer to this period
 
 
 [2]
 In a defined contribution plan, the employer contribution is fixed or determined by a formula and benefits are based on the contribution of the employer. A defined benefit plan is one in which the contributions to be made are calculated to achieve a specific benefit at a time certain in the future
 
 
 [3]
 Forfeitures occur when employees leave the company prior to full vesting. Until the employee has been a plan participant for five years, his account is not fully vested. Upon termination, the unvested portion is forfeited for redistribution among the remaining employee accounts
 
 
 [4]
 The plan provides for a hardship exception to this election, in the event of financial need
 
 
 [5]
 This provision affected an older employee's benefit because the benefit was calculated by using an individual's average monthly compensation and his years of credited service (up to 35 years). Therefore, if an employee worked past age 65, his retirement benefit would not increase even if his salary during the last five years or his years of service increased
 
 
 [6]
 The Court explicitly held that section 4(f)(2) did not "establish[ ] a defense to what otherwise would be a violation of the Act." Betts, 492 U.S. at 181, 109 S.Ct. at 2868. Cf. Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 124-25, 105 S.Ct. 613, 623, 83 L.Ed.2d 523 (1985) (characterizing sections 4(f)(1) and 4(f)(2) as affirmative defenses to liability)
 Appellees argue for the first time on appeal that Betts should not be applied retroactively. We conclude that Betts should apply retroactively. Retroactivity will clearly further the operation of the rule of Betts, and there do not appear to be substantial inequitable results from retroactive application here. See Chevron Oil Co. v. Huson, 404 U.S. 97, 106-07, 92 S.Ct. 349, 355, 30 L.Ed.2d 296 (1971); Austin v. City of Bisbee, 855 F.2d 1429, 1432 (9th Cir.1988). In addition, this circuit has previously applied Betts retroactively. See Robinson v. County of Fresno, 882 F.2d 444, 445 (9th Cir.1989) (applying Betts without considering its retroactivity under Chevron Oil ).
 
 
 [7]
 Ordinarily, however, when there is direct evidence of discrimination, such as when a provision is discriminatory on its face, the prima facie case analysis is inapplicable. Thurston, 469 U.S. at 121, 105 S.Ct. at 621-22
 
 
 [8]
 Congress has since declared a contrary rule for the future. See 29 U.S.C. § 623(f)(2), as amended October 16, 1990
 
 
 [9]
 At the time of the cross-motions for summary judgment, there was no dispute regarding the declaration of Virginia Gould. Farmers did not submit declarations contradicting Gould's statement until it moved for reconsideration in light of Betts. Nothing in the record indicates that the district court agreed to reconsider summary judgment on the basis of evidence which Farmers could have produced earlier but did not. It reconsidered its grant of summary judgment only because of new legal precedent. Even if Gould's evidence were not considered, an inference of discriminatory intent was raised by the other evidence
 
 
 [10]
 In 1986, Congress deleted the upper age limit for the class of persons protected by the ADEA. It now protects all persons age 40 and over. 29 U.S.C. § 631(a). Under both the 1978 and 1986 versions of the ADEA, mandatory retirement is permitted for executives who are entitled to a certain level of pension and other post-retirement benefits. 29 U.S.C. § 631(c)
 
 
 [11]
 Under the plan, an employee was eligible to receive 20% of his account balance, as of December 31st, 120 days after his fifth December 31st as a plan participant, and 20% of the account balance each year thereafter, unless he irrevocably elected to defer receipt until retirement. The account balance as of any given December 31st included the amounts actually in the account as of that date, adjusted by all charges and allocations for that calendar year, including those which were not required to be made by Farmers until it filed its tax returns for that year. Thus, the employee received almost immediate distribution of 20% of the amounts added to his account that year. In this respect, the plan operated much like a year end bonus program
 
 
 [12]
 Under the plan in effect in 1979, employees who were leaving to open a Farmers' agency could take the whole vested part of their account out in a lump sum. Others who terminated were paid the balance of their accounts in five equal annual payments after termination. In 1985, the plan was amended so that all employees who terminate employment (for reasons other than death, disability or retirement) receive the whole of their account balances over a five year period. This also undercuts the retirement aspect of the profit sharing plan
 
 
 [13]
 This, of course, assumes that some economic disaster has not greatly reduced values between December 31 and the end of the 120 day period
 
 
 [14]
 Assuming that the profit sharing plan is a retirement plan, under the 1979 Labor Department regulations, the plan would have been considered a "supplemental" defined contribution plan because Farmers also maintains a defined benefit plan (the pension plan). 29 C.F.R. § 860.120(f)(iv)(B)(1). These regulations provided that an employer could cease contributions to a defined contribution plan which was not a supplemental plan, but stated that the provisions did not apply to supplementary plans. Id. The provisions also stated that an employer could not allocate forfeitures less favorably on the basis of age, regardless of whether a defined contribution plan was supplemental or not. 29 C.F.R. § 860.120(f)(iv)(B)(2)
 
 
 [15]
 We recognize Betts' holding that an employer need not prove cost justification in order to avoid a finding of subterfuge. 492 U.S. at 175, 109 S.Ct. at 2865. However, Betts did not make cost totally irrelevant to the inquiry. Certainly there is nothing in this record to suggest that Farmers' decision was driven by mere cost considerations rather than considerations of a more malevolent sort
 
 
 [16]
 The EEOC action alleged only that the profit sharing plan violated the ADEA. It did not request any relief with respect to the pension plan
 
 
 [17]
 Brown had not lost any pension benefits because he had asked to be reinstated to employment and the court had ordered his reinstatement. The employer had represented to the court that upon Brown's reinstatement, it would fully credit his pension plan as if he had continued working. Thus, at Brown's retirement, he would receive the same pension as if he had not been unlawfully fired. 883 F.2d at 514-15
 
 
 [18]
 All appellees who had not retired as of December 1, 1988 were to have their pension benefits adjusted pursuant to changes in the law and the pension plan
 
 
 [19]
 The district court found that Farmers had also violated ERISA. We do not decide that issue, since it was simply an alternate ground for the district court's decision, a decision which was fully supported by its ADEA determination. Appellees also made claims under state law. The district court did not found Farmers' liability upon those state law claims, and no cross-appeal was taken by the appellees. Thus, that issue is not properly before us