United States Court of Appeals,

Fifth Circuit.

No. 91–2882.

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff–Appellant,

v.

BOEING SERVICES INTERNATIONAL, a/k/a Boeing Aerospace Operations, Inc., Defendant–Appellee.

Aug. 19, 1992.

Appeal from the United States District Court for the Southern District of Texas.

Before GOLDBERG, DUHÉ, and BARKSDALE, Circuit Judges.

GOLDBERG, Circuit Judge:

The psalmist wrote: "Cast me not off in the time of old age." *Psalms* 71:9. Congress seemingly acknowledged this ancient supplication in 1967 when it enacted the Age Discrimination in Employment Act. 29 U.S.C. §§ 621–634. Congress intended the Act to eradicate arbitrary age discrimination in employment, 29 U.S.C. § 621(b), and thus prohibited discrimination against persons forty years of age and older in the workplace based on their age. 29 U.S.C. §§ 623(a), 631(a); *see Thornbrough v. Columbus and Greenville R.R. Co.,* 760 F.2d 633, 637 (5th Cir.1985).

On cross-motions for summary judgment, the district court entered judgment against the appellant, the Equal Employment Opportunity Commission, who asserted, on behalf of retired employees of The Boeing Company, that Boeing Services International discriminated against them in violation of the Age Discrimination in Employment Act. The court confronted a legal question of dispositive importance: Whether "equivalent pay," which compensated employees laid off from The Boeing Company and hired by Boeing Services International for lost matching contributions to a retirement plan and lost paid holidays, constituted a "bona fide employee benefit plan" under the Age Discrimination in Employment Act, 29 U.S.C. § 623(f)(2). We agree with the district court that the equivalent pay program indeed constituted a "bona fide employee benefit plan" and thus affirm the entry of summary judgment.

I.

The Boeing Company contracted with the National Aeronautics and Space Administration ("NASA") to provide engineering support services to the space shuttle program. An operating division of The Boeing Company located in Houston ("Boeing–Houston" or "B–H") performed the contract work for NASA. To increase its competitiveness when NASA rebid this particular contract, The Boeing Company reorganized its Houston operating division, Boeing–Houston, into a wholly-owned subsidiary of Boeing, Boeing Services International ("BSI"). B–H ceased to exist after September 30, 1983. As planned, Boeing bid through BSI.

BSI was able to bid more competitively than B–H for several reasons. First, under the B–H voluntary investment retirement plan employees contributed a percentage of their salary to the plan and received a matching contribution up to four percent of their base pay from B–H. BSI did not offer a voluntary investment retirement plan, choosing to replace it with a deferred compensation plan that included no employer matching contributions. Second, B–H employees received twelve paid holidays, while BSI employees received nine paid holidays. NASA awarded the contract to BSI, a company unencumbered by the financial obligations of matching contributions to a voluntary investment retirement plan or paying for holidays in addition to those on the federal government holiday calendar.

Effective September 30, 1983, all B–H employees were laid off from The Boeing Company. BSI offered the laid-off B–H employees positions as new employees of BSI beginning October 1, 1983, with the same positions, assignments and salaries the employees enjoyed at B–H. For these "incumbents," those "employees placed on layoff from The Boeing Company and accepting offers of employment with BSI," BSI also offered something called "equivalent pay." This dispute has developed out of the equivalent pay program. As BSI explained in a brochure distributed to potential incumbents in "orientation briefings" during July and August of 1983, the incumbents would receive equivalent pay "to provide for the loss of three paid holidays and The Boeing Company contribution

to participants in the Voluntary Investment Plan." The formula calculated equivalent pay as a percent of the employee's base salary, but the equivalent pay did not comprise "a part of the base salary."[1] BSI established a new retirement plan and, as explained above, a deferred compensation plan for all of its employees.

In a letter dated August 10, 1983, B–H employees were informed that "[t]hose employees [accepting lateral offers of employment from BSI] who choose to retire from The Boeing Company and who continue employment with BSI Houston will not receive equivalent pay...." At least twenty-eight of the persons laid off from Boeing–Houston on September 30 were at least 55 years of age and had a minimum of ten years service with The Boeing Company, which entitled them to retire and draw a pension from Boeing. After accepting employment with BSI on October 1, 1983, working for BSI during the fall of 1983 and receiving equivalent pay from BSI, these incumbents elected to retire from The Boeing Company. These individuals continued working for BSI, yet they did not receive equivalent pay from BSI after their retirement from The Boeing Company. The twenty-eight retired incumbents did receive both wages from BSI and retirement benefits under The Boeing Company retirement plan.[2]

The Equal Employment Opportunity Commission brought suit against BSI on behalf of these twenty-eight individuals, claiming that BSI violated the Age Discrimination in Employment Act by denying these persons equivalent pay after they retired from The Boeing Company. Both parties

---

[1]The formula for calculating equivalent pay detailed in the brochure operated as follows. An employee would divide her net equivalent pay (the sum of annualized holiday equivalent pay and voluntary investment plan equivalent pay) by her base annual salary to arrive at a net equivalent pay percentage. "[T]o offset some of the tax consequences," the employee would increase the net equivalent pay percentage by 20% to compute the total equivalent pay percentage. The employee would multiply the total equivalent pay percentage by her hourly base rate to produce an equivalent pay hourly rate. BSI included this equivalent pay hourly rate as a "special allowance in each paycheck."

[2]The twenty-eight individuals retired before February of 1984, when Boeing amended its retirement plan to suspend the retirement benefits of an employee retired from Boeing who worked for and received wages from The Boeing Company or one of its wholly-owned subsidiaries.

moved for summary judgment. The EEOC claimed that BSI discriminated on the basis of age in the compensation, terms, conditions or privileges of employment by denying equivalent pay, characterized by the EEOC as a wage or salary, to retired incumbents in violation of section (4)(a) of the ADEA. Under section 4(f)(2) of the ADEA, however, an employer that observes the terms of a bona fide employee benefit plan does not violate the Act—unless the plan is a subterfuge to evade the purposes of the ADEA. BSI argued that the denial of equivalent pay was age-neutral because the receipt of the equivalent pay depended on continuity of employment, not age. Moreover, BSI asserted that the equivalent pay program qualified for the section 4(f)(2) exemption because the equivalent pay program represented a "bona fide employee benefit plan" that was not a scheme to evade the purposes of the Age Discrimination in Employment Act. The district court granted BSI's motion for summary judgment and denied the EEOC's motion for summary judgment. The court held that the equivalent pay program constituted a "bona fide employee benefit plan," not wages or salaries. According to the district court, section 4(f)(2) of the ADEA sheltered the equivalent pay program because no evidence showed that the equivalent pay program was a subterfuge to evade the purposes of the ADEA. The EEOC appeals from that judgment.

## II.

The Federal Rules of Civil Procedure set the standard for a district court deciding a motion for summary judgment. Summary judgment is appropriate only if no genuine issue exists over any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). In reviewing a summary judgment decision, the court of appeals employs this same standard used by the district court. *South Cent. Bell Tel. Co. v. Canal Place Ltd. Partnership,* 927 F.2d 867, 868 (5th Cir.1991) (citation omitted). Our function in reviewing the district court's decision is thus two-fold. First, we must decide whether the district court "overlooked or impermissibly resolved any disputed material facts." *Abourezk v. New York Airlines, Inc.,* 895 F.2d 1456, 1458 (D.C.Cir.1990); *see Richardson v. Pennzoil Producing Co.,* 896 F.2d 919, 921 (5th Cir.1990). Our second job on appeal involves deciding whether the district court correctly applied the relevant law to the undisputed facts.

*Abourezk,* 895 F.2d at 1458. In the cross-motions for summary judgment, the parties agreed that no facts were in dispute. Our overriding task in this appeal, then, focuses on whether these undisputed facts truly entitle BSI to judgment as a matter of law.

## III.

Congress enacted the Age Discrimination in Employment Act to accomplish three plainly stated goals: 1) to promote the employment of older persons based on their ability rather than their age; 2) to prohibit arbitrary age discrimination in employment; and, 3) to provide help to employers and workers in finding ways of meeting problems arising from the impact of age on employment. 29 U.S.C. § 621(b); *see Jensen v. Gulf Oil Refining and Mktg. Co.,* 623 F.2d 406, 408 (5th Cir.1980). Accordingly, section 4(a)(1) of the Age Discrimination in Employment Act makes it illegal "for an employer to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual *with respect to [the individual's] compensation, terms, conditions, or privileges of employment,* because of such individual's age." 29 U.S.C. § 623(a)(1). In section 4(f)(2) of the Act, however, Congress expressly permitted employers to discriminate based on age in "observ[ing] the terms of ... *any bona fide employee benefit plan such as a retirement, pension, or insurance plan* "—so long as the employer's compliance with the plan did not represent "a subterfuge to evade the purposes" of the Act. *Id.* at § 623(f)(2).[3] Section 4(f)(2) of the Act thus exempts certain "age-based

[3]In full, section 623(f)(2) provides that

> [i]t shall not be unlawful for an employer, employment agency, or labor organization to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual.

29 U.S.C. § 623(f)(2) (1985).

Congress enacted the Older Workers Benefit Protection Act in 1990, which amended, *inter alia,* section 623(f)(2). Pub.L. No. 101–433, § 103(1), 104 Stat. 978, 979 (Oct. 16, 1990) (codified at 29 U.S.C. § 623(f)(2) (Supp.1992)). Congress gave only prospective effect to the legislation. Pub.L. No. 101–433, § 105(a), 104 Stat. at 981.

employment decisions ... from the prohibitions of the ADEA." *Public Employees Retirement System of Ohio v. Betts,* 492 U.S. 158, 161, 109 S.Ct. 2854, 2858, 106 L.Ed.2d 134 (1989).

In *Betts* the Supreme Court clarified the meaning and defined the scope of the section 4(f)(2) exemption. Section 4(f)(2) simply describes "the type of employer conduct that is prohibited in the employee benefit plan context." *Id.* 492 U.S. at 181, 109 S.Ct. at 2868. When deciding whether a plan or program merits the sanctuary of section 4(f)(2) under *Betts,* a court must engage in a two-fold analysis.

First, is the plan or program of the type subject to the section 4(f)(2) exemption? The presence of "any bona fide employee benefit plan such as a retirement, pension, or insurance plan" forms the initial prerequisite for application of section 4(f)(2). The Act fails to define the phrase. The *Betts* Court faced a lower court holding that limited the section 4(f)(2) exemption to plans that justified age-based reductions in benefits by age-related cost considerations. Unlike the Sixth Circuit below, the Supreme Court read the expression quite broadly. "The statute's use of the phrase "*any* employee benefit plan' seem[ed] to imply a broad scope for the statutory exemption, and the "such as' clause suggests enumeration by way of example, not an exclusive listing." *Betts,* 492 U.S. at 173, 109 S.Ct. at 2864 (emphasis in original). This court has similarly interpreted the "key" phrase, "employee benefit plan." Fifteen years before *Betts,* we held that "the words retirement, pension or insurance are added in a clearly descriptive sense, not excluding other kinds of employee benefit plans...." *Brennan v. Taft Broadcasting Co.,* 500 F.2d 212, 215 (5th Cir.1974). The *Betts* Court, however, expressed "no opinion ... on the precise meaning of the phrase," holding "only that it d[id] not support the cost-justification requirement."[4] *Id.* 492 U.S. at 174 n. 6, 109 S.Ct. at 2865 n. 6; *see*

Since the EEOC filed their complaint in 1989, the amendment does not affect this appeal and does not control our analysis. *See Equal Employment Opportunity Comm'n v. Westinghouse Elec. Corp.,* 925 F.2d 619, 622 n. 2 (3rd Cir.1991).

[4]We note that, through the Older Workers Benefit Protection Act, "Congress has since declared a contrary rule for the future." *American Ass'n of Retired Persons v. Farmers Group, Inc.,* 943 F.2d 996, 1001 n. 8 (9th Cir.1991), *cert. denied,* ⸺ U.S. ⸺, 112 S.Ct. 937, 117

*id.* 492 U.S. at 166, 109 S.Ct. at 2860 ("whatever the precise meaning of the phrase ... it is apparent that a disability retirement plan falls squarely within that category"); *see Equal Employment Opportunity Comm'n v. Westinghouse Elec. Corp.,* 925 F.2d 619, 623 (3rd Cir.1991) (the Court "declined to decide the precise meaning of the phrase ... found in § 4(f)(2)").

Two interrelated questions complete the first segment of the two-part section 4(f)(2) inquiry. Is the plan a "bona fide" plan, that is, does the plan " "exist[ ] and pay[ ] benefits' "? *Betts,* 492 U.S. at 165, 109 S.Ct. at 2860 (quoting *United Air Lines, Inc. v. McMann,* 434 U.S. 192, 194, 98 S.Ct. 444, 446, 54 L.Ed.2d 402 (1977)); *see Alford v. City of Lubbock,* 664 F.2d 1263, 1269 (5th Cir.) (citing *Jensen,* 623 F.2d at 413, for the proposition that " "[a] retirement plan is bona fide if it is genuine and pays substantial benefits.' "), *cert. denied,* 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 848 (1982); *Brennan,* 500 F.2d at 217 ("given its ordinary and commonly accepted meaning, the term bona fide is synonymous with "genuine' or "authentic' "). Neither party disputes that the BSI equivalent pay program existed and that BSI paid amounts to qualifying incumbents. Also, did the employer "observe the terms of" the plan? The parties concede that, in refusing to extend equivalent pay to incumbents who retired from The Boeing Company, BSI "observe[d] the terms of" the equivalent pay plan. *See Betts,* 492 U.S. at 165, 109 S.Ct. at 2860. Since the parties' concessions pretermit consideration of these two aspects of our initial investigation, we first focus on whether the equivalent pay program constituted "any ... employee benefit plan."

If the employer did "observe the terms of ... any bona fide employee benefit plan," then the statute requires us to ask whether the plan is "a subterfuge to evade the purposes of the" Age Discrimination in Employment Act. A program that qualifies as an "employee benefit plan" under the initial requirement "is entitled to the protection of the § 4(f)(2) exemption"—*unless* the plan is such

---

L.Ed.2d 108 (1992); *see supra* note 3. Congress restored the "original congressional intent in passing and amending the [ADEA], which was to prohibit discrimination against older workers in all employee benefits except when age-based reductions in employee benefit plans are justified by *significant cost considerations.*" Pub.L. No. 101–433, § 101, 104 Stat. at 978.

a subterfuge. *Betts,* 492 U.S. at 166, 109 S.Ct. at 2860. "The term "subterfuge' must be given its ordinary meaning as "a scheme, plan, stratagem, or artifice of evasion,' " which, "in the context of § 4(f)(2), connotes a specific "intent ... to evade a statutory requirement.' " *Id.* 492 U.S. at 168, 171, 109 S.Ct. at 2861, 2863 (quoting *McMann,* 434 U.S. at 197, 98 S.Ct. at 450). Section 4(a)(1) prohibits workplace age discrimination with respect to an employee's "compensation, terms, conditions, or privileges of employment." Importantly, the *Betts* Court held that "both § 4(a)(1) and § 4(f)(2) could be given effect only if § 4(f)(2) is viewed as exempting bona fide plans that are not "a method of discriminating in other, *non* fringe-benefit aspects of the employment relationship.' " *Westinghouse,* 925 F.2d at 623 (quoting *Betts,* 492 U.S. at 177, 109 S.Ct. at 2866) (emphasis added). While the Court failed to define the term "nonfringe-benefit," the decision certainly means that "the term[ ] "bona fide employee benefit plan' " used in section 4(f)(2) and the term " "nonfringe benefit' [implicated in section 4(a)(1) ] are mutually exclusive." *Id.* As we read the decision, the term "employee benefit plan" simply means the fringe benefit aspects of the employment relationship.

Congress exempted discrimination in the fringe benefit aspect of the employment relationship, choosing to legislate "only as to hiring and firing, wages and salaries, and other nonfringe-benefit terms and conditions of employment" and leaving "the employee benefit battle for another day."[5] *Betts,* 492 U.S. at 177, 109 S.Ct. at 2866. An employer does not violate the ADEA by making age-based distinctions in dispersing fringe benefits. *Id.* When an "employee benefit plan" varies *fringe benefits* based on age, that plan is illegal if the employer adopted it with the intent to discriminate against older employees regarding a *nonfringe-benefit* term and condition of employment. *Equal Employment Opportunity Comm'n v. City Colleges,* 944 F.2d 339, 341 (7th Cir.1991) (citing *Betts,* 492 U.S. at 169–184, 109 S.Ct. at 2862–68). "Any attempt to avoid the prohibitions of the Act by cloaking forbidden discrimination in the guise of age-based differentials in benefits ... fall[s] outside the § 4(f)(2) exemption." *Betts,* 492 U.S. at 180, 109 S.Ct. at 2867.

---

[5]That day arrived in 1990. *See supra* note 3.

The illegality of age-based distinctions in fringe benefits thus depends on whether the employer intended to discriminate in a nonfringe benefit area of employment. *See City Colleges,* 944 F.2d at 342. *Betts* held that section 4(f)(2) requires that the plaintiff shoulder the burden of showing subterfuge—an "actual intent" on the part of the employer "to discriminate in those [*non* fringe-benefit] aspects of the employment relationship protected by the provisions of the ADEA."[6] *Betts,* 492 U.S. at 181, 109 S.Ct. at 2868 (holding that "§ 4(f)(2) redefines the elements of a plaintiff's prima facie case instead of establishing a defense," ruling that the Public Employees Retirement System discriminated based on age in observing the terms of a "bona fide employee benefit plan" and remanding to afford the plaintiff an opportunity to prove subterfuge).

We return to the threshold issue in the section 4(f)(2) analysis: Whether the equivalent pay program constituted "any ... employee benefit plan." *Betts* teaches that this issue reduces to one question: Did the equivalent pay involve a fringe benefit or nonfringe benefit aspect of the employment relationship? Courts generally distinguish between "nonfringe benefits," typified by wages and salaries, on the one hand, and "fringe benefits," enumerated by example in section 4(f)(2) as retirement, pension and insurance plans. A nonfringe benefit immediately compensates an employee for current services—job performance—while a fringe benefit ordinarily rewards the employee for longevity. *Farmers,* 943 F.2d at 1003; *Westinghouse,* 925 F.2d at 626. A fringe benefit lacks the compulsive thrust of the basic compensation, terms, conditions and privileges of employment. The Third Circuit held that a severance plan constituted an "employee benefit plan." Severance pay is linked to an employee's length of service, for it becomes available as a benefit only to those employed for a specified period, and the occurrence of a layoff, for the severance pay provides short-term financial assistance during the post-layoff transition period. *Westinghouse,* 925 F.2d at 626 (holding that the EEOC conceded at trial that the fringe benefit severance plans did not

---

[6]The Older Workers Benefit Protection Act rejected this holding by placing the burden to offer cost justifications for age-based employment decisions on the *employer.* We repeat that this legislation applied only prospectively. *See supra* note 3; *see also Gray v. York Newspapers, Inc.,* 957 F.2d 1070, 1084 n. 8 (3rd Cir.1992).

constitute a subterfuge under section 4(f)(2)).  The Ninth Circuit characterized a profit sharing plan as a "hybrid."  *Farmers,* 943 F.2d at 1003.  The plan in question exhibited qualities of a fringe benefit because it functioned as a retirement plan.  On the other hand, the plan also implicated the notion of a nonfringe benefit because the employer designed the plan "to compensate for work actually performed by the employee" and the employees treated the plan as one providing "immediate compensation once an employee ha[d] been with the company for five years."  *Id.*  (holding that the profit sharing plan violated the ADEA by denying wages to employees over age 65 solely on the basis of age);  *see id.* at 1003–05 (holding that to the extent the profit sharing plan represented an "employee benefit plan," the plan was a subterfuge to evade the purposes of the ADEA).

The district court held that the equivalent pay program constituted a "bona fide employee benefit plan" under section 4(f)(2).  Because "equivalent pay ha[d] nothing to do with current performance," since the employees' base pay did not include equivalent pay and because the equivalent pay simply substituted for lost holiday pay and lost matching contributions to the voluntary investment plan, the court characterized the equivalent pay as a fringe benefit.

The EEOC argues that the equivalent pay constituted a nonfringe benefit aspect of the employment relation governed by the standard in section 4(a)(1) of the ADEA.  First, the EEOC quarrels with the district court's mode of analysis.  According to the EEOC, this Court must apply an objective test and disregard the employer's motives in extending the challenged measure to incumbent employees.  If not, any employer could gain the protection of section 4(f)(2) by characterizing a nonfringe benefit as an "employee benefit plan."[7]

The realities of the program govern our inquiry.  *See Betts,* 492 U.S. at 178–80, 109 S.Ct.

---

[7]We pause briefly to note that if the issue was before us, we would not hold that a cat was a dog simply because a defendant called the cat a dog.  *Cf.* William Shakespeare, *Romeo and Juliet* act II, sc. ii ("What's in a name?  That which we call a rose By any other name would smell as sweet.").

at 2867. The evidence demonstrates that BSI offered incumbent employees the equivalent pay to replace the lost paid holidays and lost contributions to the retirement plan, not, as the EEOC asserts, to compensate the incumbents for current services based on their past work for B–H. The brochure distributed to the incumbents stated that the incumbents would receive equivalent pay "to provide for the loss of three paid holidays and The Boeing Company contribution to participants in the Voluntary Investment Plan." The substituted items—the lost holiday pay and retirement contributions—determined the composition and, indeed, the very existence of the equivalent pay. The "pay" was equivalent to what the employees would have received in the form of paid holidays and matching retirement contributions if they had not experienced the layoff and remained at B–H. In the words of the Ninth Circuit, the way the equivalent pay program was "structured and treated by [BSI] employees," it rewarded the employees for longevity and continuity of service by bridging the fringe benefits gap between B–H and BSI.

BSI asserts that the lost items constituted fringe benefits and argues that the substitute, equivalent pay, naturally deserves the same designation. We find this argument quite convincing. Certainly matching contributions to a retirement plan constitute a fringe benefit, for the statute describes retirement plans as one of the enumerated examples of an "employee benefit plan." *See* 29 U.S.C. § 623(f)(2).

BSI maintains that lost holiday pay also represents a fringe benefit because it does not "relate to" current performance—all employees receive paid holidays. The EEOC, however, labels the holiday pay as a nonfringe benefit. The EEOC likens the lost paid holidays to routine vacation pay, pointing to the Supreme Court decision in *Massachusetts v. Morash,* 490 U.S. 107, 109 S.Ct. 1668, 104 L.Ed.2d 98 (1989). The *Morash* Court decided whether a policy of paying employees for unused routine vacation time constituted an "employee welfare benefit plan" within the meaning of ERISA or an exempted payroll practice. Stressing the purpose of ERISA, to eliminate the "mismanagement of funds accumulated to finance employee benefits" through "extensive reporting, disclosure, and

fiduciary duty requirements," the Court held that ordinary vacation payments "present[ed] none of the risks that ERISA [wa]s intended to address." *Id.* 490 U.S. at 115, 109 S.Ct. at 1673. Rather, the routine vacation payments at issue were "fixed, due at known times, and d[id] not depend on outside contingencies." *Id.* The Court thus refused to characterize the routine vacation pay policy as an "employee welfare benefit plan" within the meaning of ERISA. *Id.* 490 U.S. at 120–21, 109 S.Ct. at 1676.

The EEOC argues that holiday pay, like the routine vacation pay policy in *Morash,* constitutes a nonfringe benefit because it does not depend on any contingency outside the control of the employee. Although the Supreme Court used this criterion to characterize a "payroll practice" as falling outside the statutory bounds of ERISA, *Morash,* 490 U.S. at 114–16, 109 S.Ct. at 1673, this is not an ERISA case. The purposes of the controlling statute in *Morash* counsel against affording this factor determinative importance in resolving a similar issue under the ADEA. The *Morash* Court refused to categorize the vacation pay policy as an "employee welfare benefit plan" in part because the Court feared the consequences of imposing the detailed reporting and disclosing requirements of ERISA on the millions of employers that compensate employees for unused vacation time and expanding the jurisdiction of the federal courts. *Id.* 490 U.S. 116–20, 109 S.Ct. at 1674–75. In light of these concerns, the *Morash* Court narrowly construed the phrase "employee welfare benefit plan" for the purposes of ERISA. The *Betts* Court believed that Congress intended to give a "broad scope" to the statutory exemption of section 4(f)(2) by using the phrase "*any* employee benefit plan." Because of this purposive juxtaposition, we hesitate to analogize between the character of an item for the purposes of ERISA and its nature within the meaning of the ADEA. This is an ADEA case, not an ERISA case. Moreover, even if we were to apply the *Morash* test here, the evidence demonstrates that the equivalent pay did depend on a contingency outside the control of the employee—the layoff from B–H. Finally, we deem holiday pay more akin to health insurance—a fringe benefit ordinarily available on an immediate and equal basis to all employees—than vacation pay—compensation dependent on current job performance. BSI did not offer equivalent pay to

compensate the incumbent employees for work actually performed by the employee for BSI, but to replace fringe benefits lost when the employee experienced a layoff at B–H and accepted employment at BSI. For that reason, we characterize the equivalent pay as a fringe benefit and hold that the equivalent pay constituted a "bona fide employee benefit plan" within the meaning of the ADEA. As interpreted by the *Betts* Court, the phrase "employee benefit plan" is "broad enough to encompass a variety of fringe benefits," including the equivalent pay program. *Westinghouse,* 925 F.2d at 626.

The EEOC next contends that the employees "earn equivalent pay only as they work," therefore, the argument continues, the equivalent pay benefit compensates the employee for current services performed for the employer. If the employee stops working for BSI, the employee stops receiving equivalent pay. According to the EEOC, this means that equivalent pay constitutes a nonfringe benefit aspect of the employment relation. As BSI correctly points out, an employee who stops working for an employer would lose both wages and certain fringe benefits. An employer ordinarily discontinues most fringe benefits when an employee stops working for the employer. This does not mean that those fringe benefits compensate the employee for current services and thus constitute nonfringe benefits, just as the fact of working does not determine the character of all items included in the employee's total compensation package.[8]

Finally, the EEOC argues that the equivalent pay constitutes a nonfringe benefit because BSI calculated the equivalent pay as a percentage of the employee's base salary. BSI responds that it offered equivalent pay to replace lost fringe benefits, which transformed the equivalent pay into a fringe benefit. See supra page 16. We agree with the district court and BSI that expressing equivalent pay as a percentage of wages merely enabled BSI to accurately replace the value of the lost fringe benefits. As employers often do when computing fringe benefits, B–H originally calculated

_____

[8]Similarly, the EEOC argues that the equivalent pay secured the current services of B–H incumbents at BSI and thus represent a nonfringe benefit. All benefits extended to employees, both fringe and nonfringe, secure their current services. The issue is whether the benefit provides immediate compensation for the performance of their job.

both the matching contributions and paid holidays as a percentage of wages. Equivalent pay does not become a nonfringe benefit simply because BSI calculates equivalent pay as a percentage of a nonfringe benefit.

Because we have held that BSI "observ[ed] the terms of ... a bona fide employee benefit plan," we continue to the second query in the section 4(f)(2) analysis: Whether the equivalent pay program was a subterfuge to evade the purposes of the ADEA. As in *Betts,* the equivalent pay plan logically could be a subterfuge to evade just one of the goals of the ADEA: The elimination of arbitrary age discrimination in employment. *Betts,* 492 U.S. at 175–76, 109 S.Ct. at 2865; *see supra* slip opinion page 6562. Specifically, then, did the EEOC meet its burden of showing that the retired incumbents' lack of access to the equivalent pay fringe benefit "was the result of an intent to discriminate in some nonfringe-benefit aspect of the employment relation?" *Id.* 492 U.S. at 182, 109 S.Ct. at 2868. The employee bears the burden of showing not only that "a discriminatory benefit plan implicates nonbenefit aspects of employment, but also that it was intended to discriminate." *Betts,* 492 U.S. at 186, 109 S.Ct. at 2871 (Marshall, J., dissenting); *see id.* 492 U.S. at 180–82, 109 S.Ct. at 2868.

The district court held that the EEOC failed to present evidence that the equivalent pay program was a subterfuge to evade the purposes of the ADEA. The EEOC did not brief the subterfuge issue in this court, choosing to develop its theory that the plan fell under section 4(a)(1) of the Act. The EEOC neither argued nor produced proof that BSI did specifically intend to discriminate in a nonfringe benefit aspect of the employment relationship protected by the ADEA through the "employee benefit plan," the equivalent pay program. Our review of the record reveals no evidence showing that the equivalent pay program implicated a nonfringe benefit aspect of the employment relationship or that BSI intended to discriminate in that aspect. *See* Dist.Ct.Op. at 7, 8 (concluding that the evidence showed that "these individuals incurred [no] loss or changes in their terms or conditions of employment" and that "the decision to deny equivalent pay to the individuals

on whose behalf the EEOC has brought this litigation was not based on age"). The EEOC has not carried its burden of proof to remove the equivalent pay program from the section 4(f)(2) exemption.

## IV.

Remembering the admonition of the psalmist, we scrutinized this case with exacting care. No genuine issue exists over any material fact in this case challenging the provisions of an equivalent pay program under the Age Discrimination in Employment Act. The district court correctly applied the relevant law, section 4(f)(2) of the ADEA, to the undisputed facts in entering summary judgment for defendant BSI. For these reasons, we AFFIRM the judgment of the district court.